822 F.2d 844
 60 A.F.T.R.2d 87-5294, 56 USLW 2064, 87-2
USTC P 9431
 Katherine Jean GRAHAM, Petitioner-Appellant,
v.
COMMISSIONER OF INTERNAL REVENUE SERVICE, Respondent-Appellee.
Richard M. HERMANN, Petitioner-Appellant,
v.
COMMISSIONER OF INTERNAL REVENUE SERVICE, Respondent-Appellee.
David Forbes MAYNARD, Petitioner-Appellant,
v.
COMMISSIONER OF INTERNAL REVENUE SERVICE, Respondent-Appellee.
 Nos. 84-7794, 84-7798 and 84-7799.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Dec. 10, 1985.
Decided July 17, 1987.
 
 Eric M. Lieberman & Nicholas E. Poser, New York City; Christopher Cobb, Pasadena, Cal.; Meade Emory, Seattle, Wash.; Lee Boothby, Barrien Springs, Mich., & Roger H. Zirprick, San Bernardino, Cal., for petitioners-appellants.
 John F. Murray, Robert S. Pomerance and Robert A. Berstein, Washington, D.C., for the respondents-appellees.
 Appeal from a Decision of the Tax Court of the United States.
 Before WRIGHT, KENNEDY and BEEZER, Circuit Judges.
 KENNEDY, Circuit Judge:
 
 
 1
 Taxpayers Katherine Jean Graham, Richard M. Hermann, and David Forbes Maynard appeal the Tax Court's decision upholding the determination of the Commissioner of Internal Revenue that they were not entitled to deduct certain payments made to the Church of Scientology, 83 T.C. 575. Appellants contend that they were entitled to the deductions under I.R.C. Sec. 170 (1987), that denial of the deductions violates their rights under the free exercise and establishment clauses of the first amendment, U.S. Const. amend. I, and that the Commissioner has selectively enforced the tax laws against them in violation of their rights under the first and fifth amendments. U.S. Const. amends. I, V.
 
 
 2
 It has been conceded by the government, for purposes of this case, that the Church of Scientology is a religion entitled to receive deductible charitable contributions, and that its adherents are entitled to first amendment protections for the practice of Scientology. Some of the facts were stipulated to the Tax Court, along with numerous exhibits. The parties also stipulated to the entire record in a related case, Church of Scientology of California v. Comm'r, 83 T.C. 381 (1984). The historical or background facts are essentially uncontroverted on appeal, except for the relevance of certain matters. The Tax Court found that the payments in question were not charitable donations because of the motives and intent of the payors, and this ultimate factual finding is much contested on the appeal.
 
 
 3
 The First Circuit has issued an opinion in a case in which it considered the issues present in this case on a record identical to the one we review here. Hernandez v. Comm'r, 819 F.2d 1212 (1st Cir.1987). Judge Coffin's opinion is thorough and insightful, and we reach the same conclusions as the First Circuit does, with some differences in emphasis and analytic approach. We affirm the Tax Court's decision.
 
 
 4
 The appellants are Scientologists and were so during the tax years in question. Scientology teaches that the individual is a spiritual being having a mind and a body. Part of the mind, called the reactive mind, is unconscious. It is filled with mental images that are frequently the source of irrational behavior. Through the administration of a Scientology process known as auditing, an individual, called a preclear, is helped to erase his reactive mind and gain spiritual competence. Auditing is also referred to as processing, counseling, and pastoral counseling. Training, a Scientology discipline distinct from auditing, involves courses of instruction in the tenets of Scientology.
 
 
 5
 Scientologists believe that they can attain benefits from auditing and training, but only in degrees or steps. These include levels called Grades and higher levels called OT sections. The various steps or degrees of accomplishment are set forth in a chart entitled Classification Gradation and Awareness Chart of Levels and Certificates.
 
 
 6
 A trained Scientologist, known as an auditor, administers the auditing. He is aided by an electronic device called an E-meter. This device helps the auditor identify the preclear's areas of spiritual difficulty by measuring skin responses during a question and answer session. These auditing sessions are offered in fixed blocks of time called Intensives.
 
 
 7
 Training is also delivered to Scientologists by a trained Scientologist. Course offerings range from basic courses which introduce the doctrines and texts of Scientology through advanced courses which train and qualify auditors to deliver auditing at the highest level.
 
 
 8
 One of the tenets of Scientology is that any time a person receives something, he must pay something back. This is called the doctrine of exchange. The Church of Scientology applies this doctrine by charging a fixed donation for training and auditing. With few exceptions, these services are never given for free. Thus, fixed donations are generally a prerequisite to a person's receiving auditing and training. These fixed donation payments constitute the majority of the Church of Scientology's funds and are used to pay the costs of Church operations and activities.
 
 
 9
 Over the period at issue, the general rates for the fixed donations for auditing varied with the amount of auditing time involved. The Church's price lists disclose that fees for auditing services ranged from $625 for a 12 1/2 hour intensive to $4,250 for a 100-hour intensive, with additional fees for specialized types of auditing. Members of the Church of Scientology are encouraged to make advance payments for Scientology courses. If payment is made well in advance of the services to be rendered, a discount of 5 percent can be obtained by the member. When a Scientologist makes an advance payment, the Church credits his account. Once the individual begins receiving a service, his account is debited. It is the Church of Scientology's policy to refund advance payments upon request at any time before services are received.
 
 
 10
 The Church of Scientology promotes its services through free lectures, congresses, free personality tests, and handouts. Advertisements are placed in newspapers, magazines, and on the radio. These promotional activities are geared to be responsive to community concerns, which are determined from surveys.
 
 
 11
 The Tax Court found that the Church of Scientology operates in a commercial manner in providing these religious services. By internal policy memoranda, the Church sets the goal of making money, and it is an idea which permeates virtually all of the Church of Scientology's activities, its services, its pricing policies, its dissemination practices, and its management decisions.
 
 
 12
 In 1972 Graham made payments totaling $1,682 to the Church of Scientology, Hawaii, and to the Scientology and Dianetic Center of Hawaii. Of this amount, approximately $400 went toward training, and the balance went for auditing. Some of the payments toward courses were for Graham's daughters, Karen and Laurel. When Graham made those payments, she expected to receive, and did receive, the benefit of those services. On her 1972 income tax return, Graham deducted $1,682 as a charitable contribution.
 
 
 13
 In 1975 Hermann paid the Church of Scientology, American Saint Hill Organization, $4,875. At the time Hermann made these transfers, he expected to receive Class 0 to 9 training. Although Hermann did not take these courses, he did take other Scientology courses and has received auditing between 1974 and the present. On his 1975 income tax return, Hermann deducted $3,922 as a charitable contribution.
 
 
 14
 In 1977 Maynard paid the Church of Scientology, Mission of Riverside, $4,698.91 as advance payments for services. Although Maynard did not receive any services in 1977, he made those remittances with the expectation of taking Interiorization Processing, Expanded Dianetics, and auditing. On his 1977 income tax return, Maynard claimed a $5,000 charitable contribution deduction.
 
 
 15
 The Commissioner disallowed these claimed charitable contribution deductions, and the Tax Court upheld the Commissioner's decision. It held that the remittances to the Church of Scientology were not contributions or gifts within the requirements of section 170 because they "were not voluntary transfers without consideration, but were made with the expectation of receiving a commensurate benefit in return." Graham v. Comm'r, 83 T.C. 575, 581 (1984). The Tax Court rejected appellants' challenge under the free exercise clause, holding that "there is no constitutional right to a tax deduction," id., and that any burden on religion was justified by the "broad public interest in maintaining a sound tax system." Id. at 582 (quoting United States v. Lee, 455 U.S. 252, 260, 102 S.Ct. 1051, 1056, 71 L.Ed.2d 127 (1982)). The Tax Court also rejected appellants' claim under the establishment clause because the tests for determining deductibility under section 170 were based on secular criteria. See id., 83 T.C. at 583. The Tax Court held that appellants' claim of selective discrimination was not supported by evidence of discriminatory action by the Commissioner or any of his agents.
 
 
 16
 We must determine first whether appellants' fixed donations qualify for the deduction granted by I.R.C. Sec. 170. Section 170 grants a deduction for "charitable contributions" made within the taxable year. Section 170(c) defines "charitable contribution" as "a contribution or gift to or for the use of" a variety of entities, among which are bodies that are "organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes ... or for the prevention of cruelty to children or animals," provided that they meet certain other requirements. I.R.C. Sec. 170(c)(2).
 
 
 17
 It has been stipulated for the purposes of this case that the Church of Scientology is a religion and an organization to which charitable contributions may be made under section 170. The statutory issue is whether or not appellants' payments qualified as "contribution[s] or gift[s]."
 
 
 18
 The Tax Court, relying on DeJong v. Comm'r, 36 T.C. 896 (1961), aff'd, 309 F.2d 373 (9th Cir.1962), and Haak v. United States, 451 F.Supp. 1087 (W.D.Mich.1978), held that appellants' fixed donations did not qualify for the deduction because they were not "voluntary transfers without consideration, but were made with the expectation of receiving a commensurate benefit in return," i.e. the transfer was a quid pro quo. 83 T.C. at 581. Appellants contend that the Tax Court applied an incorrect rule of law to their case by failing to focus on the nature of the benefits they received from the Church.
 
 
 19
 To the extent that an articulated legal standard is set out by the Tax Court as the basis for its decision, we will review that standard as a matter of law, while recognizing the special expertise of the Tax Court in deciding questions of law under the Internal Revenue Code. Magneson v. Comm'r, 753 F.2d 1490, 1493 (9th Cir.1985). The findings of the Tax Court disallowing claimed deductions will not be disturbed unless those findings are clearly erroneous. See Kalgaard v. Comm'r, 764 F.2d 1322, 1323 (9th Cir.1985).
 
 
 20
 We agree with the legal standards followed by the Tax Court in its decision, and we do not find its factual conclusions clearly erroneous. Implicit in the Tax Court's opinion is the recognition that the controlling question is not whether the payments in question were gifts for a religious purpose, but whether, consonant with the controlling rules and regulations, they were gifts at all.
 
 
 21
 The rule in this circuit is that a charitable gift or contribution must be a payment made for detached and disinterested motives. This formulation is designed to ensure that the payor's primary purpose is to assist the charity and not to secure some benefit personal to the payor. See Babilonia v. Comm'r, 681 F.2d 678, 679 (9th Cir.1982) (per curiam); Allen v. United States, 541 F.2d 786, 788 (9th Cir.1976); Collman v. Comm'r, 511 F.2d 1263, 1267 (9th Cir.1975); Stubbs v. United States, 428 F.2d 885, 887 (9th Cir.1970), cert. denied, 400 U.S. 1009, 91 S.Ct. 567, 27 L.Ed.2d 621 (1971); DeJong v. Comm'r, 309 F.2d 373, 376-79 (9th Cir.1962). Though it is true that the entire complex of a payor's motives often is not divorced from self-interest, see Crosby Valve & Gage Co. v. Comm'r, 380 F.2d 146, 146-47 (1st Cir.1967), and that in the strictest sense a true charitable purpose implies detriment to the donor, the law does not go so far. The test of detached and disinterested motive is designed to determine that no measurable, specific return comes to the payor as a quid pro quo for the donation. This focus on the external features of the transaction serves as an expedient for any more intrusive inquiry into the motives of the payor. See id. at 147; Singer Co. v. United States, 449 F.2d 413, 422 (Ct.Cl.1971).
 
 
 22
 We think this is a proper approach and find it in full accord with the Supreme Court's recent opinion in United States v. American Bar Endowment, 477 U.S. 105, 106 S.Ct. 2426, 91 L.Ed.2d 89 (1986). The Court held that "[t]he sine qua non of a charitable contribution is a transfer of money or property without adequate consideration." Id. at 2434. If the contributor expects a substantial benefit in return, then the contribution cannot be deducted. Id. at 2433; S.Rep. No. 1622, 83d Cong., 2d Sess. 196, reprinted in [1954] U.S. Code Cong. & Ad. News at 4629. If a transaction is structured in the form of a quid pro quo, where it is understood that the taxpayer's money will not pass to the charitable organization unless the taxpayer receives a specific benefit in return, and where the taxpayer cannot receive the benefit unless he pays the required price, then the transaction does not qualify for the deduction under section 170.
 
 
 23
 It is the structure of the transaction, and not the type of benefit received, that controls. Although we have often viewed the receipt of an economic benefit as sufficient to bar a section 170 deduction, see Collman, 511 F.2d at 1267; Stubbs, 428 F.2d at 887; United States v. Transamerica Corp., 392 F.2d 522, 524 (9th Cir.1968), we have not held that the receipt of an economic benefit is the exclusive indicium of a nonqualifying transaction. See Babilonia, 681 F.2d at 679 (no reference to economic benefits); DeJong, 309 F.2d at 378 ("[w]here the payment is in return for services rendered, it is irrelevant that the donor derives no economic benefit from it") (quoting Comm'r v. Duberstein, 363 U.S. 278, 285, 80 S.Ct. 1190, 1197, 4 L.Ed.2d 1218 (1960) (quoting Robertson v. United States, 343 U.S. 711, 714, 72 S.Ct. 994, 996, 96 L.Ed. 1237 (1952))); cf. Allen, 541 F.2d at 788 (trial court found "no benefit, economic or otherwise"). Rewards or benefits to a payor can disqualify whether or not defined in economic terms. A donor will be found to lack a detached and disinterested motive for receipt of such noneconomic benefits as the right or privilege of adopting a child, Murphy v. Comm'r, 54 T.C. 249 (1970), or accompanying the child to provide guidance and companionship. Babilonia, 681 F.2d at 679. The test is not the economic character of what the payor receives but whether there is a specific, measurable quid pro quo for the donation in question. Though the economic aspect of a reward makes it easier to identify such a transaction, it is not a precondition to application of the test.
 
 
 24
 It is also the rule that the deductibility of a contribution does not depend on whether the benefits received in return are secular or religious. Section 170 authorizes deductions for contributions for charitable, scientific, literary, or educational purposes, and does not favor religious organizations over others entitled to benefit from taxpayers' deductible gifts or contributions. The statute cannot be read to permit religions to offer a deductible quid pro quo while other charitable organizations may not. Hernandez, 819 F.2d at 1217. It follows that the nature of a disqualifying quid pro quo does not depend on its secular or nonsecular character. The inquiry remains whether the donation is intended to benefit the charity without reference to a reciprocal and specific benefit to the donor, whether or not the benefit is religious. The taxpayers have not met that test here.
 
 
 25
 The Tax Court's ruling that appellants' fixed donations did not qualify for the deduction under the standards we have discussed is a determination of fact, see Babilonia, 681 F.2d at 679; Allen, 541 F.2d at 788; Collman, 511 F.2d at 1267, and the evidence here is fully sufficient to sustain it. Solicitation for the services and agreements to render them based on price; conformity in price lists, and graduated prices based on the level of instruction; the contractual right to receive the service, and the right of refund if the service was not performed; account cards; and discounts for advance payments, all underscore that the payment matched, with some precision, the benefits to be received. That the benefit may have had value only to religious adherents is not significant, given its measurable attributes. The value of the quid pro quo received by the taxpayers was easy for the Tax Court to determine, simply by looking at the amount of money they were willing to pay for it in a market setting.
 
 
 26
 The record discloses that appellants looked upon their donations as payments made for the quid pro quo receipt of a definite number of hours of auditing or training. Appellant Graham stated that she "expected to get particular religious services in exchange" for her fixed donation. Appellant Hermann specifically noted the services for which he was paying on the checks that he sent to the Church. Appellant Maynard made his payments along with "Customer's Order" forms which itemized the payments as, for example, "100 hours @50.00/hr." Although appellants also stated that the payments were made out of a desire to help the Church or to support its goals, the Tax Court was not clearly erroneous in refusing to credit these statements. See Sedam v. United States, 518 F.2d 242, 245 (7th Cir.1975) (stating that "[t]he taxpayer's intention governs, not his characterization of the payments").
 
 
 27
 We cannot accept appellants' contention that their payments must be deductible because they were made in connection with the performance of a religious service, the benefit of which inures directly to the public and only indirectly to the person being audited. See Murphy, 54 T.C. at 253. As the enrollment form provided by the Church to new auditees states, "[t]he benefits obtainable from Church services ... are personal and are experienced by the individual himself or herself." If the Church's literature suggests that the auditee is the direct and primary beneficiary of the auditing services which are the fruits of his payments, then the IRS was not clearly erroneous in making a similar finding. See Estate of Wood v. Comm'r, 39 T.C. 1, 6 (1962) (holding that transfer of stock in exchange for care of cemetery lot was noncharitable because trust agreement made "no provision for expenditure of income on the cemetery as a whole, but reserve[d] all the income for care of a private lot"). The Tax Court had sufficient evidence to distinguish appellants' fixed donations from deductible payments to religious organizations in which the primary motivation is presumed to be charitable, see Rev. Rul. 78-366, 1978-2 C.B. 241 (bequest for saying of mass); Rev. Rul. 70-47, 1970-1 C.B. 49 (pew rents, building fund assessments, and periodic dues); see also Estate of Carroll v. Comm'r, 38 T.C. 868 (1962) (expenditures to rebuild parish church situated on taxpayer's land), though we are not convinced that every one of those rulings would comport with the analysis of section 170 that we have set forth here.
 
 
 28
 Because we affirm the Tax Court's decision as to payments made for both auditing and training services, we need not discuss whether the payments made for training services were "in the nature of tuition." DeJong, 309 F.2d at 379.
 
 
 29
 We turn to the taxpayers' constitutional claims under the free exercise and establishment clauses of the first amendment. Our interpretation of section 170 is that payments for auditing sessions are not deductible because the payments are keyed to a specific, reciprocal benefit received by the taxpayers. The appellants' argument seems to be that, as a result of the conflict between this interpretation of section 170 and Scientology's doctrine of exchange, a Scientologist can neither obtain the religious experience of auditing nor support the Church generally except through payments of after-tax dollars, though, by contrast, the adherents of other religions do not bear such disabilities. The taxpayers argue that a ruling which in effect limits their religion's support to after-tax dollars, and which conditions deductibility on abandonment of the doctrine of exchange, is a burden on the free exercise of their religion. This differential treatment, which favors other churches in receipt of donations, is alleged also to be a violation of the establishment clause. We rule against the taxpayers on these constitutional claims.
 
 
 30
 We first explain our free exercise analysis. To show a free exercise violation, the religious adherent, here the taxpayer, has the obligation to prove that a governmental regulatory mechanism burdens the adherent's practice of his or her religion by pressuring him or her to commit an act forbidden by the religion or by preventing him or her from engaging in conduct or having a religious experience which the faith mandates. Hobbie v. Unemployment Appeals Comm'n of Florida, --- U.S. ----, 107 S.Ct. 1046, 1049, 94 L.Ed.2d 190 (1987); Sherbert v. Verner, 374 U.S. 398, 404, 83 S.Ct. 1790, 1794, 10 L.Ed.2d 965 (1963). This interference must be more than an inconvenience; the burden must be substantial and an interference with a tenet or belief that is central to religious doctrine. See Thomas v. Review Board, 450 U.S. 707, 717-18, 101 S.Ct. 1425, 1431-32, 67 L.Ed.2d 624 (1981) (burden exists when state's regulation puts "substantial pressure on an adherent to modify his behavior and to violate his beliefs"); Hernandez, 819 F.2d at 1223; Callahan v. Woods, 736 F.2d 1269, 1273 (9th Cir.1984) (burden must be substantial, if indirect).
 
 
 31
 Denial of a tax deduction is not the most serious burden the government can create, for it does not prevent the observation of the adherent's religious tenets. Bob Jones Univ. v. United States, 461 U.S. 574, 603-04, 103 S.Ct. 2017, 2034-35, 76 L.Ed.2d 157 (1983); see also Bowen v. Roy, 476 U.S. 693, 106 S.Ct. 2147, 2153-54, 90 L.Ed.2d 735 (1986) (opinion of Chief Justice Burger) (discussing seriousness of burdens). Nevertheless, receipt of a tax deduction is a government benefit that must be dispensed within the bounds of the Constitution. Regan v. Taxation With Representation of Washington, 461 U.S. 540, 544-45, 103 S.Ct. 1997, 2000-01, 76 L.Ed.2d 129 (1983). If the taxpayers can show that the government conditions receipt of a tax deduction on abandonment of a central religious practice, this is a burden cognizable under the free exercise clause. Sherbert, 374 U.S. at 404, 83 S.Ct. at 1794. Measured by these standards, we doubt the taxpayers have shown a burden on the right of free exercise.
 
 
 32
 To begin with, the fact that taxpayers will have less money to pay to the Church, or that the Church will receive less money, does not rise to the level of a burden on appellants' ability to exercise their religious beliefs. Statutes are not invalid just because they affect a religious organization's operation. EEOC v. Pacific Press Publishing Ass'n, 676 F.2d 1272, 1279 (9th Cir.1982). Courts have uniformly rejected the notion that a reduction in potentially-available disposable income by denial of a deduction, without more, works a constitutionally-recognized hardship on activities protected by the first amendment. See, e.g., Taxation With Representation, 461 U.S. at 545-46, 103 S.Ct. at 2000-01; Cammarano v. United States, 358 U.S. 498, 513, 79 S.Ct. 524, 533, 3 L.Ed.2d 462 (1958); Winters v. Comm'r, 468 F.2d 778, 781 (2d Cir.1972). Any tax reduces the amount of money available to support the taxpayer's religion.
 
 
 33
 Nor does the perceived conflict between section 170 and the doctrine of exchange, as we understand that doctrine based on the briefs and the record, create a burden on taxpayers' religious beliefs. Although appellants' brief states that the doctrine of exchange derives from the need to balance "inflow" and "outflow," taxpayers Graham and Hermann both testified that the doctrine of exchange did not require the payment of money in return for training and processing. Record at 203, 231. If this were so, then the Church's requirement of payment in return for these services would not be a religious practice at all.
 
 
 34
 Further, the record does not indicate that an outright contribution to the Church would be refused by it or that a donor who gave without strings would be committing an act inconsistent with central precepts of Scientology. If we are correct in this, the Scientologists are not hurt by today's ruling; to the extent a Scientologist does not want to engage in a charitable transaction, he or she is free to pursue the doctrine of exchange that the law itself recognizes as being one of reciprocal benefit; and to the extent a Scientologist wishes to make a charitable contribution, he or she appears free to do so. Taxpayers are not put to the choice of abandoning the doctrine of exchange or losing the government benefit, for they may have both. They may practice the doctrine of exchange whenever they receive a quid pro quo benefit from the Church, and still deduct whatever contributions or gifts they make.
 
 
 35
 The statute does not impose a burden on the practice of auditing. Appellants need not forswear auditing services in order to make deductible payments, nor does the denial of the deduction create substantial pressure on them to abandon the practice of auditing. This was the essential rationale of the First Circuit in Hernandez, which also rejected taxpayers' arguments in the Scientology case. Taxpayers' situation is unlike the one in Sherbert, where the individual could not be eligible for the government benefit unless she violated the precepts of her religion. Because appellants may receive the deduction without abandoning the practice of auditing, the fact that the government does not subsidize appellants' practice of auditing does not create a burden of the type recognized by Sherbert.
 
 
 36
 Though entertaining these doubts as to the validity of the taxpayers' positions, we do recognize that our own interpretation of the religion may be a disputed component of our reasoning. If so, further inquiry is warranted, for it is beyond our authority or our competence to give our own interpretation to religious principles. United States v. Lee, 455 U.S. 252, 257, 102 S.Ct. 1051, 1055, 71 L.Ed.2d 127 (1982). Though we feel bound to observe that the record for a free exercise burden is probably insufficient in this case, we nevertheless will accept for the remainder of our analysis the most favorable cast that can be put on the taxpayers' case. We will assume that a Scientologist may neither practice his or her religion nor support it without accepting reciprocal, quid pro quo benefits, and that as such charitable deductions are unavailable to the true believer in Scientology doctrine.
 
 
 37
 Even on this view of the case, however, we find no free exercise violation in the enforcement of the donative intent requirement of section 170. If the rules for the receipt of governmental benefits or exemption require a person to violate religious principles that are central to the particular faith, the government must accommodate the religious belief unless there is a compelling state objective for imposition of the rule in the particular case. This, as we understand it, is the holding of Sherbert v. Verner, 374 U.S. at 406, 83 S.Ct. at 1795, as reaffirmed in Hobbie v. Unemployment Appeals Comm'n of Florida, 107 S.Ct. at 1049. We find that the government has met its burden on this issue.
 
 
 38
 The governmental interests at stake are the promotion of charitable gifts and contributions to certain organizations, and more generally, the maintenance of a sound and uniform tax system. All parties agree that these are interests of the highest order. The question is whether allowing appellants to deduct their fixed donations, even though they do not fit within the requirements of section 170, would unduly interfere with the fulfillment of these important interests. Lee, 455 U.S. at 259, 102 S.Ct. at 1056.
 
 
 39
 It is hardly necessary for us to state that the charitable deduction need not be eliminated altogether, for that would defeat the objective of aiding education, science, literary pursuits, and religion, an end that has become a central feature of national tax policy. This takes us to the question of an exemption. To allow an exception for Scientologists is, we think, possible; but it is not feasible. An exemption would be fundamentally inconsistent with the elemental distinction between gifts and earned income and the concomitant congressional goal of encouraging gifts and contributions for eleemosynary purposes. See, e.g., S.Rep. 1567, 75th Cong., 3d Sess., repreinted at 1939-1 C.B. part 2, at 779, 789 ("The committee believes that charitable gifts generally ought to be encouraged...."). That factor again distinguishes this case from Hobbie and Sherbert, in which permitting sabbatarians to collect unemployment benefits was consistent with the objective of channeling those benefits to deserving recipients. Although we recognize that in some cases the government may not rely on its general interest in the underlying rule or program to overcome a claim for a religious exemption, Callahan, 736 F.2d at 1273, that principle is best applied where the underlying rule is not tied directly to the purpose of the program, as with the requirement of a social security number in the Callahan case. Where, as here, the purpose of granting the benefit is squarely at odds with the creation of an exception, we think the government is entitled to point out that the creation of an exception does violence to the rationale on which the benefit is dispensed in the first instance.
 
 
 40
 We also find the government's interest in a neutral and enforceable taxation system is compelling, as that term has been interpreted in the context of taxation cases and the first amendment. In this regard, the controlling case is United States v. Lee, in which the Court held that the government's interest in mandatory participation in the social security system outweighed the burden that compliance imposed on the taxpayer's religious beliefs. 455 U.S. at 258-60, 102 S.Ct. at 1055-56. Significantly, the Court did not analyze the problem solely in terms of exempting the few adherents whose religious views were alleged to conflict with the law; rather, it stated that "it would be difficult to accommodate the comprehensive social security system with myriad exceptions flowing from a wide variety of religious beliefs." Id. at 259-60, 102 S.Ct. at 1056. In the taxation area, then, we are directed to view the cost of creating an exemption in a more general context than in other areas of governmental regulation.
 
 
 41
 We think the government's interest is incompatible with the creation of an exemption. The Internal Revenue Code is replete with exemptions and deductions that are triggered only when certain preconditions are met. As in Lee, the compelling state goal we have identified cannot be accomplished despite the exemption of a particular individual, see Callahan, 736 F.2d at 1272-73, because the soundness of the tax system depends on government's ability to apply the tax law in a uniform and even-handed fashion, and the exemption of one presages the exemption of a great many others. The administrative difficulties in enforcing such a scheme, and the danger of manipulation, are manifest.
 
 
 42
 The taxpayers' establishment clause argument fails as well. Taxpayers argue that the rules of deductibility which we have announced will mean that their religion is inhibited, and uniquely so. This case is not one, however, in which the purpose of the government scheme is to visit a disability on a particular religion. The rules for charitable deduction are neutral in design and purpose. The precedent in Larson v. Valente, 456 U.S. 228, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982), relied upon by appellants, is inapplicable to this case, for there the law was not neutral in its design.
 
 
 43
 If we assume that the tax law, though neutral in its purpose, nevertheless has the effect of treating Scientologists more harshly than other religions, this disparate effect is not unconstitutional, for the reason that the government has a sufficient and compelling justification for its rule, in the context of tax law, as we have set forth. Denial of the deduction violates neither the free exercise clause nor the establishment clause of the first amendment.
 
 
 44
 Appellants claim that the government has selectively enforced its laws against them and not against other religious denominations. See Nietmoko v. Maryland, 340 U.S. 268, 71 S.Ct. 325, 95 L.Ed. 267 (1951); Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). This claim, however, is unsupported by evidence that the government discriminated against them in enforcing the tax laws. Their citation to internal IRS memoranda in support of their claim of selective enforcement is unavailing. Although the memoranda reveal some doubt about the proper tax treatment of appellants' fixed donations, they do not evidence the type of hostility to a target of law enforcement that would support a claim of selective enforcement. See United States v. Ness, 652 F.2d 890, 892 (9th Cir.) (per curiam) (requiring showing of impermissible motive), cert. denied, 454 U.S. 1126, 102 S.Ct. 976, 71 L.Ed.2d 113 (1981).
 
 
 45
 The decision of the Tax Court is AFFIRMED.