T.C. Memo. 2013-38

UNITED STATES TAX COURT

JAMES M. POLLARD, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 22950-09.                     Filed February 6, 2013.

<u>Edward Imatani</u>, for petitioner.

<u>Sara Jo Barkley</u>, <u>Tamara L. Kotzker</u>, <u>Robert A. Varra</u>, <u>Luke D. Ortner</u>, and

<u>Courtney L. Frola</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

JACOBS, <u>Judge</u>:  The controversy in this case involves respondent's

disallowance of a charitable contribution deduction and carryforwards which

petitioner claimed on his Federal income tax returns for 2003, 2004, 2005, 2006,

[*2] and 2007 for granting a conservation easement to Boulder County, Colorado, in 2003. The easement placed a variety of limitations on the use of petitioner's property that, according to the language of the easement, served to protect the land's natural beauty and rural character. Respondent determined that the contribution failed to satisfy the requirements of section 170 but that, assuming arguendo the requirements of section 170 were satisfied, the easement had no value on the date of grant.[1] Petitioner disagrees with respondent's determinations.

Respondent issued two notices of deficiency, one for 2003 and 2004, dated July 7, 2009, and another for 2005, 2006, and 2007, dated June 30, 2009, determining income tax deficiencies and accuracy-related penalties in the following amounts:

| Year | Deficiency | Penalty Sec. 6662(a) |
|------|-----------|-----------------------|
| 2003 | $73,942 | $14,788 |
| 2004 | 30,815 | 6,163 |
| 2005 | 25,863 | 5,173 |

---

[1]Petitioner asserts the value of the easement is $1,049,850 and claimed charitable contribution deductions of $211,261 for 2003, $93,380 for 2004, $73,303 for 2005, $89,132 for 2006, and $173,403 for 2007 after application of the percentage limitation under sec. 170(b)(1). Respondent now concedes the easement had value but asserts that the value was not more than $128,000.

| [*3] | 2006 | 29,414 | 5,883 |
| | 2007 | 57,448 | 11,490 |

In his amendment to answer, as an alternative to the 20% section 6662(a) penalty for a substantial valuation misstatement, respondent asserts petitioner is liable for the 40% penalty for a gross valuation misstatement pursuant to section 6662(h) for all years involved.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. All dollar amounts are rounded to the nearest dollar.

## FINDINGS OF FACT

Some of the facts are stipulated and are so found. We incorporate by reference the stipulation of facts, the supplemental stipulation of facts, and the attached exhibits. Petitioner resided in Colorado when he filed his petition.

On November 12, 1998, petitioner purchased a 67.51-acre parcel of farmland in Boulder County, Colorado, from Kevin Hanley for $1,100,000. Mr. Hanley had purchased the property from David and Olivia Carter on December 21, 1994.

[*4] Two houses stood on the property when petitioner acquired it, of which one was derelict. In 1999 petitioner demolished the derelict house with the intention of building a new home on the site. However, petitioner failed to obtain a demolition permit as required by Boulder County Land Use Code (Land Use Code) art. 3:3-100(b)(1)(c). Upon applying for a building permit to construct a new home, petitioner was informed that because his property consisted of less than 70 acres, he would have to obtain approval from Boulder County to increase the property's building density.

Petitioner engaged Gene Allen, a land use consultant working in Boulder County, to assist him in his dealings with the county.[2] Mr. Allen investigated several possible solutions to petitioner's problem. Ultimately Mr. Allen determined that petitioner had two options. The first option was to renew a Nonurban Planned Unit Development (NUPUD) proposal that the Carters had made when they owned of the property.[3] The Carters did not pursue their NUPUD

---

[2]Mr. Allen had previously served as land use planning director for five different counties and cities in Colorado, including Boulder County. He was a widely respected expert in land use in the State. However, Mr. Allen was not a tax professional.

[3]The Carters applied for an NUPUD that would have subdivided the property into four lots. The NUPUD approval process consists of three steps. The first step is to submit a sketch plan. The Carters submitted their four-lot sketch plan, and on

(continued...)

[**\*5**] proposal, apparently in part because the acreage of the property was not sufficient to qualify for the NUPUD program.[4]  The second option was to apply for approval to split the property into two lots (a lot split) and to obtain a subdivision exemption pursuant to Land Use Code art. 9:9-100, "Subdivision Exemptions." Subsection A of article 9:9-100 provides that "The Board of County Commissioners may grant exemptions from the definition of the terms 'subdivision' and 'subdivided land' for any division of land or construction of apartments, condominiums or multifamily dwellings, if the Board determines that such a division is not within the purpose of Article 28, Title 30 of the Colorado Revised Statutes."  Approval of a subdivision exemption is at the discretion of the board, and there are no set procedures regarding such approval.  However, Mr. Allen, on the basis of his long experience in land use planning, believed that not only could petitioner subdivide his property into two parcels, but if he so desired,

---

[3](...continued)
December 20, 1994, the Boulder County Board of Commissioners conditionally approved the sketch plan.  A sketch plan approval is valid for one year; thus, the Carters' approved sketch plan expired on December 20, 1995.  The approval was granted under the mistaken assumption that the property consisted of 70 acres.

[4]We are mindful that the Boulder County Land Use Code art. 6:6-800(A) provides:  "Before the Board of County Commissioners may approve an NUPUD * * * the applicant shall agree to grant to Boulder County a conservation easement in gross".

**[*6]** petitioner could use the subdivision exemption process to subdivide the property into four separate parcels, similar to the Carter's NUPUD sketch plan.

Petitioner decided to pursue the second option. In either December 2000 or January 2001, petitioner filed an application with the Land Use Department for a subdivision exemption to subdivide the property into two lots. On January 16, 2001, Mr. Allen mailed a letter to the Boulder County Board of Commissioners summarizing petitioner's subdivision exemption request. The letter described the property, its use as agricultural land, and petitioner's subdivision and building plan. The letter also explained why petitioner believed his request for a subdivision exemption should be approved. At this juncture, Mr. Allen did not raise the possibility of encumbering petitioner's property with a conservation easement.

Following several meetings with Boulder County officials, none of whom were tax professionals, Mr. Allen modified petitioner's subdivision exemption request in a letter to the Boulder County Board of Commissioners dated January 30, 2001. In the letter Mr. Allen raised the possibility of encumbering petitioner's property with a conservation easement.

> As stated before, the Pollard family intends to continue the use of the property for farming purposes. Accordingly, the application of

[*7] a Conservation Easement will be given serious consideration, particularly on that area of the farm lying east of the Feeder Canal.

Obviously, they will want to look at any conditions which might accompany the plans for Conservation Easement designation. These conditions and any possible financial considerations may be discussed while the application is in process. I believe that an agreement with reasonable conditions can be reached.

A public hearing with respect to petitioner's request was scheduled for March 20, 2001. In preparation for the hearing, the county's Land Use Department staff prepared a memorandum regarding petitioner's subdivision exemption request. After discussing the attributes of the property and the Carters' previous, but abandoned, NUPUD proposal, the report concluded that because of the property's size, it did not qualify for the NUPUD program.

The Land Use Department staff recommended that petitioner's exemption request be denied. The memorandum stated:

The Land Use staff finds that the application request can meet the general criteria for a subdivision exemption, as noted above. However, there are no specific criteria for lot splits in the Land Use Code. Therefore, the Land Use staff cannot recommend approval of this Exemption request.

The memorandum further stated "that there would be a benefit to the county if the applicant grants a conservation easement for the property." The memorandum concluded that if the Boulder County Board of Commissioners chose to disregard

[*8] the staff's recommendation[5] and approve the subdivision exemption request,

the exemption should be subject to seven conditions. Condition 1 required that

> The applicant/owner shall dedicate a conservation easement to
> Boulder County for the subject property * * *. The conservation
> easement shall be reviewed and approved by County staff prior to
> recording the exemption plat documents.

The March 20, 2001, hearing was held before Commissioners Jana Mendez,

Ronald K. Stewart, and Paul Danish. All three commissioners insisted that

petitioner grant a conservation easement in favor of Boulder County before they

would grant a subdivision exemption. Mr. Allen, representing petitioner, stated

that petitioner was willing to grant a conservation easement on a relatively small

portion of the property without any cost to Boulder County. The commissioners

considered this proposal to be insufficient. Commissioner Stewart stated that the

exemption request would be worth approving only if the conservation easement

encumbered the entire property. He noted that if the Boulder County Board of

Commissioners approved petitioner's request for a subdivision exemption,

petitioner would be receiving a benefit that no one else receives. Thus,

Commissioner Stewart believed there needed to be some public benefit for the

county's granting the requested subdivision exemption. At the hearing petitioner

---

[5]The Boulder County Board of Commissioners was not bound to accept the
Land Use Department's staff's recommendations.

[*9] stated that if the grant of a conservation easement did not restrict his agricultural operations (the property was a working hay farm), and if his request for exemption was approved, he likely would convey a conservation easement encumbering his entire property to the county inasmuch as he was not interested in developing the property.

Commissioner Mendez observed that petitioner would not be granting the conservation easement gratuitously since he would be receiving an increase in building density beyond that allowed by the Land Use Code. Mr. Allen agreed with this observation.

Commissioner Stewart observed that petitioner could receive certain tax benefits if a conservation easement were to be granted voluntarily and not as part of a subdivision exemption request. Commissioner Mendez suggested petitioner explore the financial and tax benefits of granting a conservation easement to the county.[6]

Petitioner replied to the commissioners' observations and suggestion with an oblique inquiry as to whether by granting a conservation easement, the Boulder County Board of Commissioners might be more agreeable to permitting a larger

---

[6]The record does not establish whether any county commissioner was a tax professional.

[*10] house to be constructed on the property. The commissioners then tabled petitioner's subdivision exemption request, pending their visit to the property.

A second public hearing regarding petitioner's exemption request was held on April 24, 2001, with Commissioners Mendez, Danish, and Stewart present. The commissioners stated that they had visited the property and that they had no objection to the construction of the new dwelling. But because there would be an increase in building density greater than that allowed by the Land Use Code, the commissioners felt that it was crucial for petitioner to convey a conservation easement to Boulder County. Commissioner Mendez emphasized that a voluntary contribution of a conservation easement would be the preferable way to proceed because of the potential tax consequences to petitioner. Mr. Allen stated that petitioner would be willing to voluntarily contribute to Boulder County a conservation easement encumbering the entire property. Petitioner's agreement to granting a conservation easement to Boulder County was "the icing on the cake" that helped convince the county commissioners to approve petitioner's request. On June 21, 2001, the county commissioners adopted Resolution 2001-52, approving petitioner's request for a subdivision exemption. The resolution made the subdivision exemption subject to a modified version of the conditions set forth in the Land Use Department's staff's recommendations. One of the modifications

**[*11]** was to revise Condition 1 to state that the county commissioners recognize petitioner's "voluntary offer" to dedicate a conservation to Boulder County. Condition 1 stated:

> Boulder County recognizes the Applicant's commitment to dedicate a conservation easement to Boulder County for the Subject Property (including the two building lots approved herein, as agreed to by the Applicant). The conservation easement shall be reviewed and approved by County staff prior to recording the exemption plat documents.

Resolution 2001-52 also stated that any development of the property was subject to Land Use Code requirements.

The adoption of Resolution 2001-52 did not complete the subdivision exemption process. To complete the process, Resolution 2001-52, as well as the subdivision exemption plat, had to be filed with the Boulder County Clerk. Testifying at the trial of this case, Dale Case, the Director of Land Use, Boulder County Land Use Department, stated that had petitioner not met the Land Use Department's staff recommendations, including the requirement that he grant a conservation easement in favor of Boulder County, then following the usual procedure of the county, in all likelihood the resolution and the subdivision exemption plat would not have been recorded.

In furtherance of petitioner's agreement to grant a conservation easement to the county, on December 13, 2001, petitioner and Boulder County entered into an

[*12] "Agreement to Make Gift" (gift agreement) pursuant to which petitioner committed to granting two conservation easements to Boulder County. The gift agreement committed petitioner to grant a conservation easement on a part of the property before December 31, 2001 (first conservation easement), and a second conservation easement on all of petitioner's property after January 1, 2003, but before January 31, 2003 (second conservation easement). On that same day, i.e. December 13, 2001, petitioner conveyed the first conservation easement to Boulder County. The easement document explained that petitioner had received Boulder County's approval of a subdivision exemption to split his property into two parcels, one of 65.78 acres (parcel 1) and the other of 1.73 acres (parcel 2). Both petitioner and Boulder County expressed their desire to enter into a conservation easement to preserve the natural features, beauty, and rural character of a 9.88-acre portion of parcel 1 (which the gift agreement referred to as parcel 1a), by limiting the maximum amount of future development that could occur on parcel 1a to that approved by Resolution 2001-52. Both the gift agreement and the first conservation easement were recorded with the Boulder County Clerk on December 20, 2001, and petitioner claimed a charitable contribution deduction

[*13] with respect to the first conservation easement on his 2001 Federal income tax return.[7]

Concurrent with the recording of the gift agreement and the first conservation easement, Boulder County recorded Resolution 2001-52 and the "Pollard Subdivision Exemption Plat", which depicted the split of petitioner's property into a 65.78-acre parcel (parcel one) and a 1.73-acre parcel (parcel 2). Pursuant to Resolution 2001-52, petitioner was granted permission to construct a single residential family home not to exceed 4,200 square feet on parcel 1.

On December 11, 2002, Greg Oxenfeld of the Boulder County Land Use Department wrote a letter to petitioner reminding him that he was required to submit the second conservation easement for review and recordation as soon as possible after January 1, 2003, but before January 31, 2003, in accordance with the gift agreement and Resolution 2001-52. Thereafter, petitioner submitted the second conservation easement to Boulder County, and it was recorded with the Boulder County Clerk on February 10, 2003. But before recording of the second conservation easement, on January 24, 2003, petitioner executed a deed

---

[7]Respondent did not challenge petitioner's 2001 charitable contribution deduction arising from the first conservation easement.

[*14] of trust with National City Mortgage Co., which resulted in the placing of a mortgage on parcel 2. That deed of trust was recorded on January 30, 2003.

The second conservation easement superseded and replaced the first conservation easement, encumbering the entire 67.51 acres of the property (i.e., both parcel 1 and parcel 2). The second conservation easement restricted the use and development of the property to that allowed pursuant to Resolution 2001-52. The second conservation easement document stated that

> Prior to the recordation of this Easement, Grantor shall obtain the written and notarized agreement of any existing senior mortgagee or lienholder in Parcel Two to subordinate their interest in Parcel Two to the County's rights to retain and enforce this Easement for the purposes described herein.

Petitioner did not subordinate the deed of trust to the second conservation Easement. Rather, petitioner informed the mortgage company of the existence of the second conservation easement.

Petitioner engaged Franklin Roberts, an experienced certified general appraiser, to prepare an appraisal report with respect to the valuation of the property and the corresponding reduction of property value following petitioner's grant of the second conservation easement. Mr. Roberts prepared an appraisal report, dated January 15, 2003, with respect to the valuation of the property as of December 30, 2002, approximately one month before the second conservation

[*15] easement was recorded. In the report Mr. Roberts, inter alia, thoroughly described the location and features of the property, attached a copy of the final draft of the second conservation easement document, stated that the method of valuation used was the before and after approach using comparable sales, stated that the donation of the conservation easement was expected to occur in January 2003, and opined that the value of the property before the easement grant was $1,617,500 and that after the grant of the second conservation easement the value of the property was $567,650. Thus, Mr. Roberts determined the value of the second conservation easement to be $1,049,850. Petitioner reported this amount on his 2003 income tax return. Mr. Roberts died prior to the date of trial.

Respondent introduced an appraisal report by his expert, Gregory Berry. Mr. Berry opined that the value of the unencumbered property was $1,938,000 and that after the grant of the second conservation easement, the value of the property was $1,810,000. Thus, Mr. Berry opined that the value of the second conservation easement was $128,000.

Petitioner timely filed his 2003 Federal income tax return. Attached to his return was a Form 8283, Noncash Charitable Contributions, reporting a noncash charitable contribution of $1,049,850 arising from petitioner's grant of the second conservation easement. Because of the limitations of section 170(b)(1)(B),

**[\*16]** petitioner claimed charitable contribution deductions on his Federal income tax returns from 2004 through 2007, as described <u>supra</u> note 1.[8]

No representative of Boulder County signed the donee portion of the Form 8283 attached to petitioner's 2003 Federal income tax return. Rather, petitioner attached an email addressed to him from a legal assistant at the law firm of Grant, Grant & Gorian LLP. In that email the legal assistant stated:

> The previous information we have used if Boulder County will not sign the donee portion of Form 8283 is as follows: The IRS states in it's [sic] instructions to Form 8283 that if it is impossible to obtain the Donee's signature on the Appraisal Summary, the deduction will not be disallowed if a detailed explanation is attached to Form 8283 as to why it is impossible to obtain a signature on page 2 of Form 8283 by a responsible person for the Donee.

> On Form 8283 where the donee signature is requested, the tax payer should write in "See Statement Attached". Attached is a sample Statement in a word format. In addition you will need to attach copies of documentation verifying the transfer as well as a copy of the Appraisal summary.

Petitioner did not attach the recommended statement to his 2003 Federal income tax return.

---

[8]Petitioner filed a joint Federal income tax return for 2003 and 2004 with his wife, Jennifer. Petitioner and Jennifer Pollard divorced in 2005. Petitioner claimed "single" as the filing status for his 2005, 2006, and 2007 income tax returns. Because respondent granted Jennifer Pollard innocent spouse relief for years 2003 and 2004, she was not included as a taxpayer on either of the two notices of deficiency issued to petitioner.

[*17]                                    OPINION

I.      Introduction

        Section 170(a)(1) provides that a deduction for a charitable contribution is

allowed only if the contribution is verified under regulations prescribed by the

Secretary.  Although section 170(f)(3) generally does not permit a deduction for a

contribution of an interest in property consisting of less than the donor's entire

interest in that property, section 170(f)(3)(B)(iii) provides an exception for a

"qualified conservation contribution".  A qualified conservation contribution is a

contribution of (1) a "qualified real property interest", (2) to a "qualified

organization", (3) which is made "exclusively for conservation purposes".  Sec.

170(h)(1).  For the donation to be deductible, the conservation purpose must be

protected in perpetuity.  Sec. 170(h)(5); sec. 1.170A-14(a), Income Tax Regs.

        Respondent challenges petitioner's deduction on several grounds, asserting:

(1) the second conservation easement was not a charitable contribution or gift as

required by section 170(c) in that it was part of a quid pro quo arrangement by

which petitioner granted the conservation easement in exchange for the granting of

his subdivision exemption request by Boulder County; (2) petitioner failed to

acquire a contemporaneous written acknowledgment from the donee organization

(i.e., Boulder County) as required by section 170(f)(8)(A); (3) petitioner's

[*18] appraisal was not a "qualified appraisal" as required by the Deficit Reduction Act of 1984, Pub. L. No. 98-369, sec. 155(a), 98 Stat. at 691, and by section 1.170A-13(c), Income Tax Regs.; and (4) the value of the easement as determined in petitioner's appraisal was overstated. Because we find that the conservation easement petitioner granted to Boulder County was a quid pro quo exchange for Boulder County's granting petitioner's subdivision exemption request, the grant of the easement does not qualify as charitable contribution or gift pursuant to section 170(a). Hence, we need not address any of the other grounds respondent asserted in disallowing petitioner the claimed charitable contribution deduction.

II.    Deductibility of the Conservation Easement

Section 170(c) defines a charitable contribution as a contribution or gift to or for the use of various specified entities or other types of entities for certain approved purposes. In reviewing the legislative history of the contribution or gift limitation, the Supreme Court noted:

> that Congress intended to differentiate between unrequited payments to qualified recipients and payments made to such recipients in return for goods or services. Only the former were deemed deductible. The House and Senate Reports on the 1954 tax bill, for example, both define "gifts" as payments "made with no expectation of a financial return commensurate with the amount of the gift."

**[\*19]** Hernandez v. Commissioner, 490 U.S. 680, 690 (1989) (quoting S. Rept. No. 83-1622, at 196 (1954) and H.R. Rept. No. 83-1337, at A44 (1954)).  The Supreme Court stressed that "'[t]he sine qua non of a charitable contribution is a transfer of money or property <u>without adequate consideration</u>.'" <u>Id.</u> at 691 (quoting <u>United States v. Am. Bar Endowment</u>, 477 U.S. 105, 118 (1986)); <u>see also</u> sec. 1.170A-1(h), Income Tax Regs.[9]  The Court of Appeals for the Tenth Circuit elaborated that "'a charitable gift or contribution must be a payment made for detached and disinterested motives.  This formulation is designed to ensure that the payor's primary purpose is to assist the charity and not to secure some benefit personal to the payor.'"  <u>Christiansen v. Commissioner</u>, 843 F.2d 418, 420 (10th Cir. 1988) (quoting <u>Graham v. Commissioner</u>, 822 F.2d 844, 848 (9th Cir. 1987), <u>aff'g</u> 83 T.C. 575 (1984), <u>aff'd sub nom.</u>  <u>Hernandez  v. Commissioner</u>, 490 U.S. 680 (1989)).  The consideration received by the taxpayer need not be financial.

---

[9]We note that in a case where a taxpayer receives consideration for a contribution, the taxpayer may still deduct as a charitable contribution the amount that exceeds the fair market value of the goods or services the grantee organization provides in exchange for the contribution.  However, the burden is on the taxpayer to make this showing.  Sec. 1.170A-1(h)(1) and (2), Income Tax Regs.  Petitioner has not established that the value of the conservation easement exceeded the value of the subdivision exemption granted to him.

[*20] Medical, educational, scientific, religious, or other benefits can be consideration that vitiates charitable intent. Hernandez v. Commissioner, 819 F.2d 1212, 1217 (1st Cir. 1987), aff'd, 490 U.S. 680 (1989).

In determining whether a payment is a contribution or a gift, the relevant inquiry is whether the transaction in which the payment is involved is structured as a quid pro quo exchange. Hernandez v. Commissioner, 490 U.S. at 701-702. In ascertaining whether a given payment was made with the expectation of any quid pro quo, courts as well as the Commissioner examine the external features of the transaction in question. This avoids the need to conduct an imprecise inquiry into the motivations of individual taxpayers. Id. at 690-691; Christiansen v. Commissioner, 843 F.2d at 420. If it is understood that the taxpayer's contribution will not pass to the recipient unless the taxpayer receives a specific benefit in return, and if the taxpayer cannot receive such benefit unless he makes the required contribution, then the transaction does not qualify for the section 170 charitable contribution deduction. Graham v. Commissioner, 822 F.2d at 849; see Christiansen v. Commissioner, 843 F.2d at 420-421.

The external features of the transaction herein demonstrate that petitioner's granting of both the first and second conservation easements to Boulder County was part of a quid pro quo exchange for Boulder County's approving his

[*21] subdivision exemption request. It is also clear that Boulder County's approval of his subdivision exemption request was a substantial benefit to petitioner. Petitioner first raised the idea of placing a conservation easement on his property following a meeting with Boulder County officials regarding his subdivision exemption request. When the Land Use staff issued its report, the staff recommended against granting petitioner's subdivision exemption request, but the report stated that the approval of the request could be justified if he granted a conservation easement to the county. At the first hearing before the Boulder County Board of Commissioners, petitioner initially declined to grant a conservation easement over his entire property, but he ultimately agreed to do so when the Commissioners insisted on it. Indeed, Commissioner Stewart stated that petitioner's subdivision exemption request would be worth approving only if the conservation easement encumbered the entire property. Commissioner Stewart stated that if the commissioners granted petitioner's subdivision exemption request, petitioner would receive a benefit that had not been granted to other residents of the county. At the followup hearing, the commissioners reemphasized their view that the granting of a conservation easement was a critical factor with respect to their granting petitioner's subdivision exemption request. Although petitioner's conservation easement grant to Boulder County was not the sole

[*22] factor influencing the decision of the commissioners, it was "the icing on the cake".

Petitioner argues that no quid pro quo arrangement existed. He asserts that the approval of his subdivision exemption request "was virtually guaranteed" and therefore there was no need for any such arrangement. Petitioner further argues that the property previously had two residences on it and the Boulder County Board of Commissioners had previously given preliminary approval to a sketch plan for four building lots on the property. Moreover, petitioner points out that the Land Use Code sections governing subdivision exemptions do not require an applicant to grant a conservation easement. Finally, petitioner notes that all of the documents relating to the granting of the second conservation easement refer to it as a gift. We are not persuaded by petitioner's arguments.

Petitioner's subdivision exemption request was far from being "virtually guaranteed"; we are of the opinion that it had little chance of being granted without petitioner's promise to grant a conservation easement to Boulder County. Indeed, the Land Use staff recommended that the subdivision exemption request be rejected unless petitioner granted a conservation easement. Further, the commissioners were unanimous in their insistence that petitioner grant a conservation easement before they would consider granting his subdivision

**[*23]** exemption request. And finally, when the subdivision exemption was granted, Resolution 2001-52 contained a requirement that petitioner grant Boulder County two conservation easements, one in December 2001 and the other no later than January 31, 2003.

Although the property previously had two dwellings, petitioner presented no evidence as to whether those dwellings were legally constructed or whether there were special circumstances surrounding their construction. And we are mindful that, as Mr. Allen noted, petitioner did not qualify for the NUPUD program, thus closing that avenue as a possibility.[10] Nor was petitioner entitled to construct two residences on the property as a matter of right, which is the reason he began his efforts to acquire a subdivision exemption from Boulder County.

Petitioner appears to have treated the granting of a conservation easement as a bargaining chip. At the first hearing, petitioner offered a conservation easement over part of the property. When this proposal was not accepted, he agreed, in principle, to grant an easement to Boulder County encumbering the whole property. At the second hearing, petitioner again offered to grant a conservation

---

[10]Even if petitioner qualified for an NUPUD, Land Code art. 6:6-800(A) requires that the recipient of an NUPUD grant a conservation easement in favor of Boulder County. See supra note 4. That would be the epitome of a quid pro quo exchange.

**[\*24]** easement, but he asked the Board whether they would consider permitting him to construct a larger house.

We are mindful, as petitioner points out, that the Land Use Code does not require the grant of a conservation easement before a subdivision exemption request is granted. And we note that Commissioner Stewart wrote a letter to petitioner on May 1, 2008, stating that to the best of his recollection, he did not require petitioner to grant a conservation easement in exchange for the subdivision exemption. But the statements of the Boulder County Board of Commissioners during the course of the two public hearings were such that we are of the opinion the Commissioners would not have been inclined to grant petitioner's subdivision exemption request had he not granted a conservation easement to the county. Moreover, the fact that Resolution 2001-52 and the Pollard Subdivision Exemption Plat were not recorded until after petitioner executed the gift agreement, in which he granted the second conservation easement, buttress our conclusion that the two transactions were connected. In sum, petitioner did not convey the second conservation easement for detached and disinterested motives but rather to secure a personal benefit. Consequently, we sustain respondent's determination that petitioner's grant to Boulder County of the second conservation

[*25] easement does not constitute a charitable contribution. See Christiansen v. Commissioner, 843 F.2d at 420.

III. Penalties

A. Introduction

Section 6662 imposes an accuracy-related penalty of 20% on an underpayment of tax attributable to, inter alia, (1) negligence or disregard of rules or regulations; (2) any substantial understatement of income tax; or (3) any substantial valuation misstatement. Secs. 6662(a) and (b)(1), (2), and (3). If any part of the underpayment is attributable to a gross valuation misstatement, the penalty is increased from 20% to 40%. Sec. 6662(h). Only one accuracy-related penalty may be imposed with respect to any given portion of an underpayment, even if that portion is attributable to more than one of the types of misconduct identified in section 6662(b). Jaroff v. Commissioner, T.C. Memo. 2004-276; sec. 1.6662-2(c), Income Tax Regs.

B. Gross Valuation Misstatement

Respondent asserts that there is a gross valuation misstatement for each of petitioner's tax years. Respondent raised this argument in his amendment to answer; consequently respondent bears the burden of proof. See Rule 142(a). A gross valuation misstatement occurs if the value or adjusted basis of the property

**[\*26]** claimed on any return is 400% or more of the correct amount of such valuation or adjusted gross basis. Sec. 6662(h)(2).[11]

Petitioner reported the value of the second conservation easement to be $1,049,850 on his 2003 income tax return. This amount exceeds 400% of the value (i.e., $128,000) now asserted by respondent.

Pursuant to section 6664(c)(2) the gross valuation misstatement penalty does not apply if (A) the claimed value of the property was based on a "qualified appraisal" made by a "qualified appraiser" and (B) in addition to obtaining such an appraisal, the taxpayer made a good-faith investigation of the value of the contributed property. Additionally, the generally applicable rules concerning reasonable cause and good faith, discussed infra pp. 29-30, apply. See Whitehouse Hotel Ltd. P'ship v. Commissioner, 139 T.C. __, __ (slip op. at 76) (Oct. 23, 2012). Respondent does not challenge that Mr. Roberts was a "qualified

---

[11]For returns filed after August 17, 2006, the applicable percentage in sec. 6662(h)(2)(A)(i) was changed from 400% to 200%. See Pension Protection Act of 2006 (PPA), Pub. L. No. 109-280, sec. 1219(a)(2)(A), 120 Stat. at 1083. However, the change in percentage does not affect this case because the penalty for a gross valuation misstatement applies to any portion of an underpayment for the year to which a deduction is carried that is attributable to a gross valuation misstatement for the year in which the carryover of the deduction arises. Sec. 1.6662-5(c), Income Tax Regs. Similarly, for returns filed after August 17, 2006, the applicable percentage with respect to the substantial valuation misstatement penalty of sec. 6662(e)(1)(A) was changed from 200% to 150%. See PPA sec. 1219(a)(1)(A), 120 Stat. at 1083.

[*27] appraiser". Respondent does, however, challenge that Mr. Roberts' appraisal report was not a "qualified appraisal". In this regard, respondent failed to meet his burden of proof.

Respondent asserts that Mr. Roberts' appraisal report (1) was made more than 60 days before the grant of the second conservation easement; (2) does not describe the property; (3) does not contain the expected date of contribution; (4) does not contain the terms of the second conservation easement; (5) does not include the appraised fair market value of the second conservation easement on the expected date of contribution; and (6) does not provide the method of valuation Mr. Roberts used in that the report does not adequately identify the highest and best use of the property. We have reviewed Mr. Roberts' appraisal; and on the basis of our review of the appraisal report as described supra p. 15, we find that the appraisal report complies with the requirements of section 1.170-13(c), Income Tax Regs.

We are especially concerned with respondent's assertion that the appraisal report is defective because it did not identify the method of valuation Mr. Roberts used. Respondent's argues that Mr. Roberts unrealistically assumed that the property could be subdivided into four parcels and if the valuation is based on an unrealistic assumption, there is no method of valuation. We disagree with

[*28] respondent's argument. Section 1.170A-13(c)(3)(ii)(J), Income Tax Regs., requires that the appraisal report merely identify the valuation method used and state the basis for the valuation. Mr. Roberts' appraisal did both. The appraisal report identified the valuation therein as being the before and after method, which is a recognized method of valuation. See Hilborn v. Commissioner, 85 T.C. 677, 688 (1985). Further, the report stated the following as the basis for the valuation: (1) the property unencumbered "had the potential for subdivision to four parcels via a prior approval from Boulder County", which was exactly what Mr. Allen, an expert in land use, stated at trial, see supra pp. 5-6, and (2) the granting of the easement "will negate all potential for using the subject land in any manner of subdivision and limits the structures which can be constructed on the site." In essence, respondent's argument goes to the reliability of the valuation determined in the report, not whether the report identified a method of valuation or the basis for the valuation.

We further find that petitioner, in addition to obtaining Mr. Roberts' appraisal, made a good-faith investigation of the value of the contributed property. Indeed, petitioner credibly testified that he consulted with Mr. Allen, reviewed the Boulder County Web site to determine the value of comparable farms, and after doing so was of the opinion that Mr. Roberts' value was conservative.

**[\*29]**  In conclusion, we hold that petitioner satisfies the section 6664(c)(2)

reasonable cause exception for underpayments related to the section 6662(h) gross

valuation misstatement penalty.

      C.     <u>Substantial Understatement of Income Tax</u>

A section 6662(b)(2) understatement of income tax is substantial if it exceeds

the greater of 10% of the tax required to be shown on the income tax return or

$5,000.  Sec. 6662(d)(1)(A).  Under section 7491(c), the Commissioner bears the

burden of production with respect to the liability of an individual for any penalty.

To meet his burden of production, the Commissioner must present sufficient

evidence to indicate that it is appropriate to impose the relevant penalty.  <u>See</u>

<u>Higbee v. Commissioner</u>, 116 T.C. 438, 446 (2001).  If the Commissioner meets his

burden, the taxpayer then bears the burden of proving the Commissioner's

determinations incorrect.  Rule 142(a)(1); <u>Welch v. Helvering</u>, 290 U.S. 111, 115

(1933).

In general, the accuracy-related penalty does not apply to any portion of an

underpayment of tax if it is shown that there was reasonable cause for such portion

and that the taxpayer acted in good faith.  Sec. 6664(c)(1).  The determination of

whether a taxpayer acted with reasonable cause and in good faith is made on a case-

by-case basis, taking into account all of the pertinent facts and circumstances.

[*30] Sec. 1.6664-4(b)(1), Income Tax Regs. Generally, the most important factor is the extent of the taxpayer's effort to assess his or her proper tax liability. Id. Reliance on professional advice may constitute reasonable cause and good faith, but "it must be established that the reliance was reasonable." Freytag v. Commissioner, 89 T.C. 849, 888, aff'd on another issue, 904 F.2d 1011 (5th Cir. 1990), aff'd, 501 U.S. 868 (1991). We have previously held that the taxpayer must satisfy a three-prong test to be found to have reasonably relied on professional advice to negate a section 6662(a) accuracy-related penalty: (1) the adviser was a competent professional who had sufficient experience to justify the reliance; (2) the taxpayer provided necessary and accurate information to the adviser; and (3) the taxpayer actually relied in good faith on the adviser's judgment. Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002); Dunlap v. Commissioner, T.C. Memo. 2012-126.

Respondent has met his burden of production with respect to the section 6662(a) substantial understatement penalty. As demonstrated supra, petitioner had substantial understatements of income tax for his 2003, 2004, 2005, 2006, and 2007 tax years because the contribution of the second conservation easement did not meet the requirements of section 170 (i.e., it was part of a quid pro quo arrangement).

[*31] Petitioner does not qualify for the section 6664(c)(1) reasonable cause exception. He did not act with reasonable cause and in good faith with respect to the second conservation easement. The evidence produced at trial demonstrates that all of the parties involved in the second conservation easement understood that the easement was contributed for the express purpose of encouraging Boulder County to grant petitioner a subdivision exemption. Indeed, it would be unreasonable for us to believe that anyone involved in this transaction (i.e., petitioner, his advisers, and the county commissioners) believed that there was an unrequited contribution.

None of the individuals that petitioner relied upon in connection with his grant of the second conservation easement to Boulder County were tax professionals. Mr. Allen was an expert in land use, not taxation. Petitioner's attorney, Cameron Grant, did not practice in the area of tax. And the Boulder County officials with whom petitioner consulted, e.g., the county commissioners and Barbara Andrews, the Boulder County attorney, did not provide him with dispassionate tax advice; rather, their goal was to complete the donation of the second conservation easement to Boulder County.

Petitioner's income tax returns were prepared by a C.P.A., but the record is devoid of any evidence that the C.P.A. knew that the conveyance of the second

[*32] conservation easement to Boulder County was part of a quid pro quo arrangement. The C.P.A. did not testify. And it is a well-established rule that the failure of a litigant to elicit testimony of another person gives rise to a presumption that if produced the testimony of that other person would be unfavorable to the litigant's case. This is especially true if, as here, the litigant (i.e., petitioner) has the burden of proof. Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), aff'd, 162 F.2d 513 (1947). To conclude, we sustain respondent's determination to impose the section 6662(a) accuracy-related penalty in this case.

**[\*33]** In reaching our holdings herein, we have considered all arguments made, and, to the extent not discussed <u>supra</u>, we conclude they are moot, irrelevant, or without merit. To reflect the foregoing,

<u>Decision will be entered</u>

<u>for respondent with respect to the</u>

<u>deficiencies in income tax and the</u>

<u>section 6662(a) substantial</u>

<u>understatement penalties for 2003,</u>

<u>2004, 2005, 2006, and 2007 and for</u>

<u>petitioner with respect to the section</u>

<u>6662(h) gross valuation misstatement</u>

<u>penalties for the aforementioned years</u>.