T.C. Memo. 2020-120

UNITED STATES TAX COURT

PETER C. EMANOUIL AND PASCALE EMANOUIL, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 5089-17.                          Filed August 17, 2020.

        P-H is a real estate developer.  In 1999 he purchased 197 acres
of undeveloped property in Town W.  Over the next several years,
P-H made various attempts to either develop or sell the 197 acres.
Ultimately, P-H obtained approval for an affordable housing project
("AHP") including 164 units on 104 of the 197 acres.  Throughout the
approval process P-H made various concessions to mitigate Town
W's concerns regarding the size of the development (including the
number of units and the acreage), potential impacts on Town W
(including traffic and other impacts), and potential environmental
concerns.  In December 2008, as the approval of the project was
coming to its conclusion, P-H donated 16 acres of his remaining
property to Town W.  Before making the donation, he had the
property appraised, and the value was determined to be $1.5 million.
In February 2009 Town W approved the AHP.  In November 2009
P-H donated an additional 71 acres to Town W.  Before making the
donation, he had the property appraised, and the value was
determined to be $2.5 million.

On their 2008 Form 1040, "U.S. Individual Income Tax Return," Ps reported a $1.5 million gift to charity and included a Form 8283, "Noncash Charitable Contributions"; but because of limitations on claiming charitable contribution deductions, Ps claimed only about $700,000 and carried the remainder forward to be claimed on returns for subsequent years. Likewise, on their Form 1040 for 2009, Ps reported a $2.5 million gift to charity and included a Form 8283 but could claim only about $660,000 and carried the rest forward. On their Forms 1040 for 2010 through 2012, Ps claimed deductions for the remaining amounts.

The IRS examined Ps' 2010, 2011, and 2012 returns and issued a statutory notice of deficiency ("SNOD") disallowing the carryover charitable contribution deductions and determining an accuracy-related penalty for each of those years. The SNOD stated the grounds for disallowing the deductions as: failure to substantiate the reported values of properties transferred and failure to show that the properties were transferred with charitable intent. Ps timely filed a petition to challenge the determinations in the SNOD. The issues for decision are: (1) whether Ps complied with the qualified appraisal requirements of I.R.C. sec. 170(f)(11)(C); (2) whether Ps' contributions were part of a quid pro quo exchange rather than a charitable gift; (3) what the fair market values were of the properties that Ps contributed; and (4) whether accuracy-related penalties apply.

Held: Ps substantially complied with the qualified appraisal requirements.

Held, further, Ps contributions were not part of a quid pro quo exchange.

Held, further, the fair market value of the property that Ps contributed in 2008 was $1.5 million, as they reported; and the fair market value of the property that Ps contributed in 2009 was $2.5 million, as they reported.

Held, further, accuracy-related penalties do not apply.

[*3]   Peter D. Anderson and Nicholas F. Casolaro, for petitioners.

Patrick F. Gallagher and Carlton W. King, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


GUSTAFSON, Judge:  Pursuant to section 6212(a),[1] the Internal Revenue Service ("IRS") determined deficiencies in tax and penalties for petitioners, Peter C. and Pascale Emanouil, in the following amounts:[2]

| Year | Deficiency | Penalties sec. 6662(h) |
|------|-----------|------------------------|
| 2010 | $184,158 | $73,663 |
| 2011 | 299,217 | 119,687 |
| 2012 | 298,228 | 119,291 |

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code (26 U.S.C.), as amended, and all Rule references are to the Tax Court Rules of Practice and Procedure.  All amounts are rounded to the nearest dollar.

[2]In the statutory notice of deficiency ("SNOD"), the IRS determined that the Emanouils were liable for 40% accuracy-related penalties under section 6662(h) for gross valuation misstatements.  It appears that the Commissioner first asserted in his answer, as an alternative, 20% penalties under section 6662(a) and (b) for substantial valuation misstatements, negligence, or substantial understatements of income tax.  The parties did not address the burden of proof as to the alternative penalties, but since we hold that the Emanouils do not owe the deficiencies, we need not address that question.

[*4] The deficiencies resulted from disallowed deductions for noncash charitable contributions in the amounts of $1.5 million and $2.5 million. The Emanouils claimed portions of the deductions on their 2008 and 2009 returns and carried forward the remaining portions and deducted those amounts for 2010, 2011, and 2012. The IRS examined the Emanouils' 2010, 2011, and 2012 returns and disallowed the deductions. The Emanouils timely filed their petition to redetermine the deficiencies. The issues to be decided are:

(1) whether the contributions failed to qualify as deductible contributions for lack of qualified appraisals (we hold that the appraisals were qualified);

(2) whether the contributions failed to qualify as deductible contributions because they were part of a quid pro quo arrangement (we hold that they were not part of a quid pro quo arrangement and do not fail to qualify);

(3) whether, as Ps claimed, the fair market value of the property that they contributed in 2008 was $1.5 million, and the fair market value of the property that they contributed in 2009 was $2.5 million (we hold that the fair market values were as Ps claimed); and

(4) whether the Emanouils are liable for accuracy-related penalties under section 6662 (we hold that they are not).

[*5]                                FINDINGS OF FACT

Mr. and Mrs. Emanouil resided in Massachusetts at the time they filed their petition.  The primary focus of this case is on the business activities of Mr. Emanouil, who owned and operated real estate businesses including Granite Hill Estates, LLC (organized under the laws of Massachusetts in 1998), and its successor, also called Granite Hill Estates, LLC (organized under the laws of Massachusetts in 2008).  (We refer to these entities collectively as "GHE LLC".)

Property at issue

On December 9, 1999, Mr. Emanouil acquired 197 acres of real property in Westford, Massachusetts, for $470,000.  The property was purchased through GHE LLC and is referred to herein as "the Granite Hill property" or "the 197 acres".  The Granite Hill property consisted of the following lots and parcels (with approximate acreage indicated):

1.    lot 1, 104.5 acres;

2.    lot 2, 26.9 acres;

3.    lot 3, 44.8 acres;

4.    lot 4, 1.66 acres;

5.    lot 5, 1 acre;

6.    lot 6, 2.85 acres;

[*6]   7.     parcel E, 0.78 acres;

       8.     parcel F, 0.41 acres; and

       9.     the Allie Lane parcel, 15 acres.

Mr. Emanouil also attempted to purchase an additional 44-acre parcel of land that abutted the Allie Lane parcel. He negotiated to purchase the 44 acres for $200,000, of which $150,000 was for the land and $50,000 was for back taxes; however, the attorney that Mr. Emanouil retained to negotiate for him had also been working for the Town of Westford and ultimately helped the town (rather than Mr. Emanouil) acquire the property in December 2000 for $425,000. Mr. Emanouil later filed a suit against the attorney and the town. Mr. Emanouil prevailed as to the attorney's breach of fiduciary duty, but the town was dismissed from the suit. The town then used the 44 acres for its Department of Public Works and built a garage ("the highway garage") on the property. Blasting during construction of the garage caused perchlorate contamination on the Allie Lane parcel.

Potential uses for the 197 acres

Over the next several years, Mr. Emanouil considered various uses for the Granite Hill property. Sometime around 2004 he offered to sell the Granite Hill property to the town, but the town had recently purchased other property and was

[*7] not in a position to make an additional purchase. Mr. Emanouil also considered potential development opportunities for the property including a flexible housing development ("the flexible development"), a local initiative project ("the LIP") to develop affordable housing under Massachusetts's Local Initiative Program pursuant to Massachusetts General Laws Chapter 40B ("chapter 40B" or simply "40B"), or a conventional 40B affordable housing project ("the Graniteville Woods project").[3]

Non-pursuit of the flexible development plan

The flexible development would have used the entire 197 acres and included 100 single-family homes, 56 apartments, 48 attached single-family homes, and 44 units of age-55-and-over housing. The benefit for the flexible development is that the plan was to be based on the number of units that could be developed under a conventional development but with the flexibility for the developer to change the layout of the houses in order to better use the natural landscape and minimize road frontage necessary for the devolvement. However, it

---

[3]Mass. Gen. Laws ch. 40B, secs. 20-23 (2020) and corresponding regulations allow a developer to seek a single comprehensive permit from a municipality's Zoning Board of Appeals (rather than several permits from various town boards). LIPs are a subset of chapter 40B projects administered by the State's Department of Housing and Community Development. For such projects, a developer partners with a municipality in planning the development. See 760 Mass. Code Regs. sec. 56.02 (2020).

[*8] became clear at a November 2005 town meeting that there was little or no support for the flexible development, so Mr. Emanouil pursued the affordable housing projects instead.

Progress with the LIP plan

Under Mr. Emanouil's proposed LIP, he would have had the town's Board of Selectmen ("the BOS")[4] be a co-applicant with him in applying for two approvals--i.e., for approval by Massachusetts' Department of Housing and Community Development of the site location and overall project details for the 40B development, and for approval of a comprehensive plan by the town's Zoning Board of Appeals ("the ZBA").[5] Having the BOS join in the application would have helped to streamline at least the ZBA approval if not both approvals. The initial LIP plan proposed to encompass all of the Granite Hill property and to include a mixture of single-family homes, condominiums, rental units, and age-55-and-over housing; and as was required for a 40B project, 25% of the units would be "affordable units".

---

[4]The BOS is the town's chief executive body. See Mass. Gen. Laws ch. 39, sec. 1 (2020); Westford Town Charter sec. 5(b).

[5]The ZBA is an independent board comprising members appointed by the BOS. The ZBA has the ultimate authority in the town to approve or reject comprehensive permits applied for under chapter 40B. See Mass. Gen. Laws ch. 40A, secs. 12, 14 (2020); 760 Mass. Code Regs. sec. 56.01 (2020).

[*9]   In January 2006 Mr. Emanouil's attorney, Douglas Deschenes, held various meetings with owners of abutting land to discuss the LIP.  The plan was slightly modified, and on January 24, 2006, Mr. Deschenes attended a BOS meeting and presented the modified plan under which only 150 acres of the Granite Hill property would be used for the development.  Actual development would occur on only 40-50 acres, and the rest of the property would be preserved as open space for trails, nature preservation, and similar uses.  As an added benefit in the modified plan, Mr. Deschenes told the BOS that Mr. Emanouil was considering donating the remaining 20 acres of the Granite Hill property for the town to develop on its own.  (Mr. Emanouil began considering donations to the town as a result of an article he read in a periodical about the tax benefits of charitable giving.)

AHC consideration of the LIP plan

On January 25, 2006, the town's affordable housing committee ("the AHC") met and was informed generally about the proposed LIP and Mr. Emanouil's desire to work with the town.  At the next AHC meeting held February 22, 2006, Mr. Deschenes presented an overview of the LIP, which would be built on 150 acres of the Granite Hill property and would include 66 single-family homes, 44 age-55-and-over single-family homes, 78 townhouse-style homes, and 60 rental apartments in two 30-unit buildings; the project would include 248 units in total

[*10] and would preserve roughly 62 units as affordable housing, though this would not include any of the age-55-and-over units as Mr. Emanouil had determined it too difficult to provide affordable housing with age restrictions.

Mr. Deschenes also explained that as part of the LIP, Mr. Emanouil was considering donating to the town the Allie Lane parcel--which abutted the 44 acres the town had acquired in 1999 and used for the highway garage. Some of the individuals present at the AHC meeting expressed concerns about the LIP including future expenses the LIP would cause to the town for municipal services relating to water, traffic, schools, etc. Other individuals at the meeting noted that landowners have the right to develop their property and that the LIP was more appealing than alternative developments or uses of the land. The AHC determined to schedule a joint boards meeting to be held on March 29, 2006, so that all the boards of the town and any owners of abutting land could discuss the LIP.

Proposal to sell to the town

On March 10, 2006, Mr. Deschenes sent a letter on behalf of Mr. Emanouil that indicated he was willing to sell all (or portions) of the Granite Hill property to the town. The letter indicated the town could purchase 180 acres for $8.5 million and Mr. Emanouil would donate his additional parcels of 20 and 25 acres, or the town could purchase portions of the Granite Hill property, and Mr. Emanouil

[*11] would look to develop the remaining portions. In a letter dated March 28, 2006, Mr. Deschenes corrected the number of acres stated in the proposed sale and the proposed developments from 180 to 150--with Mr. Emanouil still being willing to donate an additional 45 acres to the town, as he had previously indicated.

Joint consideration by the town's boards

On March 29, 2006, at the joint boards meeting, the town discussed both the proposed LIP and the offer from Mr. Emanouil to sell the Granite Hill property to the town. The boards discussed the overview of the project and the additional units it would add to the town's affordable housing inventory. The town had an obligation under Mass. Gen. Laws ch. 40B, sec. 20 (2020), to approve affordable housing projects until it reached a level of 10% affordable housing. The town was roughly 700 units short of its 10% requirement, so it was not in a strong position to deny 40B projects. The town had been granted a one-year moratorium with respect to approving 40B projects because of other projects that had recently been approved, but that one-year moratorium would soon expire. If the town approved the LIP, then under 760 Mass. Code Regs. sec. 56.03(1), (3) and (5) (2020), the town could be granted an additional two-year moratorium. The boards acknowledged that partnering in the LIP would give the town a greater

[*12] opportunity to help shape the comprehensive plan, as compared to Mr. Emanouil's independently pursuing a conventional 40B project.

The boards also discussed purchasing the land rather than partnering in the LIP. There were concerns about purchasing some of the property including the Allie Lane parcel. That parcel abutted the highway garage property but was potentially contaminated with perchlorate from blasting that had taken place when the garage was built. Nevertheless, purchasing the land would enable the town to prevent development of the property--keeping the town from becoming more like a densely populated city--and would also help the town to keep from incurring increased infrastructure costs caused by the development. No final decision was reached at the meeting, with respect either to joining in the LIP or to purchasing any of the property.

On June 27, 2006, the BOS met and discussed the fact that Mr. Emanouil was waiting for a decision regarding either proposal and that, though he felt that the LIP was dead, he would give the BOS until June 30 to decide. The BOS understood that Mr. Emanouil had been considering a conventional 40B project in the meantime and would likely proceed with such a project if the town did not decide to join in the LIP or purchase the property. The BOS formed a subcommittee to consider a potential purchase of the property for $8 million rather

[*13] than approving the LIP. The subcommittee thereafter conducted studies to determine the potential purchase options and risks to the town if it were to purchase and develop the property, and in September 2006 they commissioned Avery Associates to appraise the property for a potential purchase.

Mr. Emanouil's submission of a conventional 40B plan

By October 2006 Mr. Emanouil had not heard a final answer from the town on either the LIP or the offer to sell. As anticipated by the town boards, Mr. Emanouil submitted a plan for a conventional 40B project--i.e., the Graniteville Woods project--to the Massachusetts Housing Finance Agency ("MassHousing"), a State agency that subsidizes and administers non-LIPs. The Graniteville Woods project consisted of 248 townhouse units of which at least 25% (i.e., 62 units) would be reserved as affordable housing. The project covered the 104 acres of Mr. Emanouil's lot 1 (rather than all 197 acres, as with the previously considered flexible development plan, or 150 acres, as with the LIP). (These 104 acres did not include the portions that Mr. Emanouil later donated, i.e., lots 2 and 3 and the Allie Lane parcel.)

**[*14]** <u>Town rejection of the LIP and the purchase proposal</u>

On October 11, 2006, Mr. Emanouil sent an additional letter to the BOS reaffirming his willingness to sell parcels of the land to the town at values based on appraisals by Byrne McKinney & Associates, Inc. ("BMA"), totaling $9.3 million. On October 16, 2006, Mr. Emanouil sent a letter to the BOS notifying them of his application for a conventional 40B project submitted to MassHousing for approval.

The town held a special meeting on October 16 and 17, 2006, and voted to appropriate up to $7.4 million to acquire all or certain portions of the property from Mr. Emanouil. However, the appropriation was contingent on the town's also passing a measure to raise property taxes over the following 20 years to provide the funding, and that taxing measure would be voted on in January 2007. On October 23, 2006, the town received its appraisal from Avery Associates, who valued the 180 acres (which did not include the Allie Lane parcel) at $6.8 million in total.

In January 2007 the town met to vote on the 20-year tax increase, but the measure did not pass. The town did not move forward with either the LIP or a purchase of any of the Granite Hill property.

[*15] State approval of the Graniteville Woods project

Over the next several months, Mr. Emanouil pursued the conventional 40B project. To succeed in developing that project, Mr. Emanouil would need to obtain on his own (without the BOS as a co-applicant) approvals from the State and the ZBA. His representatives continued to attend town meetings and public hearings and to work with the town to achieve a plan for the Graniteville Woods project that would be acceptable to all parties.

In May 2007 MassHousing approved Mr. Emanouil's proposal for the 248-unit Graniteville Woods project. He had submitted that proposal in October 2006 without any specific concessions regarding concerns expressed by town boards, committees, or owners of abutting land. The MassHousing approval letter included a section with various comments that MassHousing had received from the town concerning issues that should be addressed in Mr. Emanouil's comprehensive permit application to the ZBA. These issues included such things as compliance with statutory and regulatory restrictions as well as environmental concerns (such as protection of wetlands, wildlife habitats, and conservation areas), infrastructure concerns (such as potential traffic issues and the need for sufficient crosswalks), and the need for an acceptable project schedule to be negotiated with the ZBA in light of the size of the project. Nevertheless,

[*16] MassHousing raised no issue concerning the number of units and overall size of the Graniteville Woods project, nor was there mention of any need for Mr. Emanouil to donate additional land outside of the 104-acre project site.

ZBA consideration of the Graniteville Woods project

In September 2007, Mr. Emanouil submitted a comprehensive permit application to the ZBA for approval. ZBA consideration of the proposal would not be finished until almost a year and a half later, in February 2009.

At the time Mr. Emanouil submitted his application to the ZBA, the town was no longer in its 40B safe harbor, meaning that the town could not afford to summarily deny proposed 40B developments. The application reflected various concessions that Mr. Emanouil would make for environmental and other issues raised in the MassHousing approval letter. Additionally, Mr. Emanouil's application reduced the number of units from 248 to 208, and he indicated that he would consider donating an open space easement to the town's Conservation Commission on 68 of the 104 acres.

At the October 2007 ZBA meeting, Mr. Emanouil's attorney Mr. Deschenes discussed the various measures Mr. Emanouil had been taking to address the town's concerns as expressed in the MassHousing approval letter. This included studies for environmental and traffic impacts as well as measures to increase and

**[\*17]** ensure added open areas for such uses as recreation and conservation. To the latter point, someone at the meeting (the record does not say who) asked Mr. Deschenes whether any of the 104 acres that would not be developed could be "deeded" to the town's Conservation Commission, and Mr. Deschenes said "yes". (The question did not pertain to the portions later donated--lots 2 and 3 and the Allie Lane parcel.)

At its November 2007 meeting, the ZBA discussed a potential issue regarding 25 to 30 acres in the northwest of the project site (i.e., within the 104 acres) that were potential habitats for protected turtles. But the actual development would not infringe on that area, so it was decided that there would not be an issue. At its December meeting, the ZBA discussed the civil engineers who would consult as to traffic and water issues and any potential blasting issues concerning perchlorate. Blasting reports were prepared and discussed further at the February 2008 meeting; and the ZBA's chair, Robert Herrmann, stated that he had conducted a site visit during which he had determined that the abutting properties were not as close to the potential development areas as previously thought; furthermore, the ZBA could add conditions to the permit approval that would require more stringent test blasting to ensure there would be minimal issues with blasting during the project. Traffic issues were further addressed at the

[*18] March 2008 ZBA meeting; potential drainage issues were addressed at the April 2008 meeting; and the town hired a consultant in April to prepare a financial impact analysis.

At its May 2008 meeting, the ZBA discussed the potential for developing other parcels of land as affordable housing alternatives to the Graniteville Woods project and discussed whether other land that Mr. Emanouil owned (including the Allie Lane parcel) could be donated to the town[6] or traded for other town-owned land that Mr. Emanouil might be able to develop--though no decisions were made toward alternative developments or land exchanges. In response Mr. Deschenes indicated that Mr. Emanouil might be willing to further reduce the total number of

---

[6]As the parties stipulated, during the May 21, 2008, ZBA meeting, Mr. Deschenes indicated that "they have discussed many options which could result in a better project at Graniteville Woods, a new different project for the town on town owned land with a high percentage of affordable units, and perhaps a significant amount of open space land being contributed to the Town." Mr. Deschenes further indicated that the "104-acre[s] that are proposed as part of Graniteville Woods project are in the northeast corner o[f] Mr. Emanouil's property and is being built in the front 30-40 acres. It is currently proposed that the other 60 acres of property [within the 104 acres of lot 1] will be open space as part of Graniteville Woods." In addition, he said, "there is another 16 acre parcel, parcel D, that abuts three pieces of town owned land, as well as parcel C, which is 35 acres, and parcel A which is 13 acres. Mr. Emanouil also owns the parcel on the other side of the road, parcel B. They have talked about the possibility of donating some portions of these parcels to the town, or trading for the Forest Road Parcel." What he called "parcel D" is evidently the Allie Lane parcel. We cannot precisely reconcile his description of the parcels with the list above at pp. 5-6.

**[*19]** units and also move from a 100% townhouse design and to integrate single-family homes.

At the June 2008 ZBA meeting Mr. Deschenes explained that Mr. Emanouil had been working with the ZBA's consultant in order to develop different potential designs for the Graniteville Woods project and that they could reduce the total number of units from 208 to 176 with a mixture of attached and unattached single-family homes. Mr. Herrmann indicated that he preferred this reduced plan, and the ZBA indicated the overall agreement with the revised plan because Mr. Emanouil had done "exactly what they had requested." Before the meeting was closed, Mr. Deschenes indicated that the Allie Lane parcel and the additional 35-plus acres remained on the table as proposed gifts to the town if the project were to go forward.[7]

---

[7]The relevant portion of the minutes from the June 18, 2008, ZBA Meeting are as follows:

> Herrmann [the chair] indicated he likes this mixed use development and would like to see the applicant proceed with this plan [176 units] rather than the original plan [208 units]. Deschenes indicated if the Board likes this plan they would proceed with only this plan and go ahead with engineering. The Board indicated as the applicant has done exactly what they had requested they would like to proceed with this plan. Deschenes indicated in addition to the mitigation already discussed, Mr. Emanouil owns a 16 acre parcel near Allie Lane contiguous with town land and is on the table as a proposed gift to the

(continued...)

**[\*20]** At the September 2008 ZBA meeting, Mr. Deschenes provided an update on the project including the layout and number of units with 74 units being single-family homes and 102 units being townhouses in 17 buildings. However, Mr. Herrmann indicated that he was not happy with the configuration because there was too much segregation between the townhouses and single-family homes and that the ZBA would like to see the percentage of single-family homes increased. Mr. Decshenes stated he would get answers to the ZBA's questions and concerns raised and for the two outstanding issues concerning drainage engineering and traffic reviews. No mention was made in this meeting of any contribution by Mr. Emanouil of property outside the 104 acres.

At the October 2008 ZBA meeting, Mr. Deschenes addressed the issues previously raised and informed the ZBA that as a result of the concerns for traffic, the total number of units had been further reduced to 164 units comprising 68 single-family units and 96 townhouse units. Mr. Deschenes reviewed the plan and described where units had been removed and explained that the drainage plan had also been redesigned; he also noted that they had had a preliminary meeting with

---

[7](...continued)
town if the project were to go forward, along with an additional 35+ acres contiguous with town owned land, representing an approximate value of $2 million. The 176 units make the project economically feasible.

[*21] the Water Department and a meeting with the Conservation Commission and that the plan met or exceeded the requirements for local wetland bylaws. Again, no mention was made in this meeting of any contribution by Mr. Emanouil of property outside the 104 acres.

In November 2008 Mr. Deschenes sent a letter to the ZBA's fiscal consultant to provide the revised plan details for purposes of the fiscal impact study. The letter included various references to revisions in engineering plans, development of recreational fields, and construction of sidewalks and trail networks. The letter also included the proposed land donations of the Allie Lane parcel and the other tracts.[8] In addition to sending the letter, Mr. Deschenes

---

[8]Relevant excerpts from the letter are as follows:

The Site contains approximately 104+/- acres and is located on the easterly side of North Main Street, the northerly side of West Street and the Easterly side of Cowdry Hill Road. Graniteville Woods, LLC, an entity controlled by Mr. P. Charles Emanouil, has site control of the property. Mr. Emanouil also controls a parcel to the west of the site as well as a parcel to the north of the subject site, abutting the new Westford Public Works facility. These abutting parcels are not part of the subject Comprehensive Permit application, however, at this time Mr. Emanouil is proposing to donate a large portion of the abutting properties to the Town of Westford.

\* \* \* \* \* \* \*

(continued...)

[*22] attended the ZBA meeting that month at which he informed the ZBA that virtually all of the concerns previously raised had been addressed and that the information had been provided for the financial impact analysis, which was in process.

In December 2008 Mr. Deschenes attended the Conservation Commission's meeting and informed them that the plan was "to donate many acres to the Town for preservation", i.e., 68 of the 104 acres in the project. (Initially, Mr. Emanouil's intention was to donate the land to the Conservation Commission in fee simple. However, the town did not want to hold the 68 acres, which had significant granite

---

[8](...continued)

**Donations/Mitigation**

-Memorandum of Understanding for Bid on "Edwards Parcel"
-Engineering on "Edwards Parcel" including on site testing and plans
-Development of a Recreational Field Inside the Project
-Construction and Design of sidewalk from Project to St. Catherine's Church (Valued at approximately $70,000.00)
-Construction and Design of sidewalk from Project to Hillside Avenue or Equivalent donation or work at other location. (Valued at approximately $45,000.00)
-Establishment of Trail network within Project with lighted trail from Project to St. Catherine's Church
-Land Donations
        -Allie Lane Subdivision Parcel. 16.0 acres, worth approximately 1.9 Million Dollars.
        -"Lot 2" as shown on enclosed plan, less one buildable lot and West Street/Cowdry Hill Parcel, less one buildable lot together worth approximately 2 Million Dollars.

[*23] holes from previous quarrying activity, and instead directed Mr. Emanouil to grant a conservation easement in favor of the Conservation Commission. That contribution is not at issue in this case.) This 68 acres did not include the portions at issue here that were later donated--lots 2 and 3 and the Allie Lane parcel.

Preparing for the donations

Before donating any land to the town, Mr. Emanouil informed Morris & Morris, P.C., the accounting firm who would prepare his tax returns, that he desired to make the charitable contributions. He told them that he wanted to know what was required to claim corresponding deductions. Morris & Morris researched the rules and reporting requirements (including the instructions for Form 8283, "Noncash Charitable Contributions") and informed Mr. Emanouil of the requirements for deducting such contributions and of the documentation they would need in order to prepare the returns.

Donation of the Allie Lane parcel

In addition to donating a conservation restriction on 68 acres of the land within the Graniteville Woods project, Mr. Emanouil decided to donate outright additional parcels of land including the Allie Lane parcel, which were outside of and unrelated to the development. On December 15, 2008 (less than 30 days before the donation), Mr. Emanouil received an appraisal from BMA giving a

**[\*24]** "current market value estimate" of the Allie Lane parcel at $1.5 million, based on the highest and best use of the land being a 12-lot subdivision for single family residential use. The appraisal stated that its purpose was "[t]o inform a potential disposition."

On December 16, 2008, the BOS met and Mr. Herrmann updated the BOS on the status of the project. The BOS indicated the ZBA had done a wonderful job working with Mr. Emanouil on the Graniteville Woods project. On December 17, 2008, the ZBA met, and the chair, Mr. Herrmann, indicated that nearly all issues concerning engineering, traffic, perchlorate contamination caused by the town's blasting, and the mitigation package for the Graniteville Woods project had been addressed and that only the revised pro forma and the fiscal impact report remained outstanding. As a result, he was in favor of "closing" (i.e., concluding) the public hearing process even without the updated pro forma and the fiscal impact report; if the other members of the ZBA did not agree, Mr. Herrmann wanted to schedule another meeting before the end of the year.

Concluding the hearing before the end of the year was desired to facilitate Mr. Emanouil's donating the Allie Lane parcel before year's end; and although the donation was not in fact a condition of the ZBA's approval or an aspect of "mitigation" required by the ZBA to approve the permit, Mr. Herrmann wished to

[*25] close the hearing and oblige Mr. Emanouil. The ZBA agreed and closed the public hearing, though the voting to actually approve the permit would not take place until the beginning of 2009.

After the ZBA voted to close the hearing, Mr. Herrmann informed Mr. Deschenes that the proposed donation of the Allie Lane parcel was to go under the control of the BOS, rather than the Conservation Commission.

Mr. Emanouil executed a quitclaim deed on behalf of GHE LLC to donate the Allie Lane parcel to the BOS on December 29, 2008.[9] For the reasons explained below in part III.B, we find that at that time the parcel had a value of $1.5 million.[10]

Final ZBA approval

In its January 2009 meeting, the ZBA voted to approve all but three of the waivers that had been requested for the Graniteville Woods project. The three remaining waivers needed revised wording.

_____

[9]The deed was recorded in February 2010. However, the parties have stipulated that the Allie Lane parcel "was effectively conveyed to the Town of Westford on December 29, 2008", and the Commissioner has not disputed that 2008 was the proper year for claiming the deduction.

[10]At trial petitioners' expert valued the Allie Lane parcel at $1.5 million, and the Commissioner's expert valued it at $130,000, less than a tenth of petitioners' expert's valuation. We assess these competing claims below in part III.B.

**[\*26]** On February 11, 2009, the ZBA met and voted to approve the remaining waivers. On February 17, 2009, the ZBA voted to issue the permit for the Graniteville Woods project.

Donation of the remaining parcels

At the ZBA meeting on March 18, 2009, the members discussed Mr. Emanouil's desire to donate the remaining parcels of land (i.e., lots 2 and 3) that were not part of the Graniteville Woods project. At that point the parcels needed to be subdivided to create individual lots to be donated to the town.

On September 4, 2009 (i.e., more than six months after the ZBA issued the permit for the Graniteville Woods project), Mr. Emanouil sent a letter to the town's Conservation Commission stating that he intended to deed lots 2 and 3 to the Conservation Commission.[11] On September 14, 2009, he sent a similar letter to the BOS regarding the proposed transfers. In October 2009 Mr. Emanouil received an appraisal from BMA giving--"as of October 23, 2009"--a "current

---

[11]Mr. Emanouil's letter to the Conservation Commission (and his subsequent letter to the BOS) also stated that he intended to grant, in favor of the Westford Land Trust, conservation restrictions on lots 2 and 3 (and on approximately 68 acres within the Graniteville Woods project). The record shows a conservation restriction granted on the 68 acres within Graniteville Woods but does not show whether he granted such a conservation restriction on lots 2 and 3. Neither party's appraisal mentions any conservation restriction on lots 2 and 3, and neither party argues that any such restriction affects the value of the donation to the town's Conservation Commission, so we do not address it further.

[*27] market value estimate" for lots 2 and 3 of approximately $2.5 million, which was based on the highest and best use for the land being a 38-lot subdivision. Like the previous appraisal for the Allie Lane parcel, the appraisal for lots 2 and 3 stated that its purpose was "[t]o inform a potential disposition."

On November 17, 2009 (less than 30 days after the appraisal date), Mr. Emanouil executed a quitclaim deed on behalf of GHE LLC to donate lots 2 and 3 to the town's Conservation Commission, which accepted the deed on November 18, 2009. For the reasons explained below in part III.C, we find that as of the date of contribution lots 2 and 3 had a value of $2.5 million.[12]

Tax returns and claimed charitable contribution deductions

The Emanouils hired Morris & Morris to prepare their returns for 2008 through 2010, hired Anstiss & Co., P.C., to prepare their return for 2011, and hired Litmangerson Associates to prepare their return for 2012. For 2008 and 2009 Mr. Emanouil provided to Morris & Morris the documentation, which included fair market value appraisals of the contributed properties; and for each subsequent year, the Emanouils' accountants prepared the returns using the documentation that Mr. Emanouil provided.

_____

[12]At trial petitioners' expert valued lots 2 and 3 at $2.5 million, and the Commissioner's expert valued them at $1.42 million. We assess these competing claims below in part III.C.

[*28] On their Form 1040, "U.S. Individual Income Tax Return," for 2008, the Emanouils reported a $1.5 million gift to charity for their donation of the Allie Lane parcel. The Emanouils included with their return a Form 8283 showing the date of the contribution and attached the appraisal prepared by BMA that valued the land at $1.5 million on the basis of a highest and best use of the land being a 12-lot subdivision.

The appraisal attached to the return did not include a statement explicitly indicating that it was prepared for income tax purposes; and the appraisal did not include a statement as to the expected date of contribution. The fair market value as determined in the appraisal would not have been different had the appraisal included a statement that it was prepared for income tax purposes, and the appraisal date--"as of December 1, 2008"--was in fact within 30 days of the date of contribution, December 29, 2008. Despite the claimed $1.5 million appraised value, the Emanouils claimed for 2008 a charitable contribution deduction of only $683,329 (in compliance with the annual limits of section 170) and carried forward $809,481 (which included $2,810 of other gifts by cash or check claimed on Schedule A, "Itemized Deductions," of the return).

On their Form 1040 for 2009, the Emanouils reported a charitable contribution of $2.5 million for their donation of lots 2 and 3. The Emanouils

[*29] included with their return a Form 8283 showing the date of the contribution, and they attached the BMA appraisal valuing the land at $2.5 million as of October 23, 2009, on the basis of the highest and best use being a 38-lot subdivision. The appraisal did not state that it was prepared for income tax purposes; and the appraisal did not include an expected contribution date. In compliance with the limits of section 170, the Emanouils claimed carryover charitable contribution deductions of $658,613--from 2008--and carried forward $2,651,277 to subsequent years.

On their Form 1040 for 2010, the Emanouils reported carryover charitable contributions of $2,651,277 from which they claimed deductions of $526,111 and carried forward the remaining $2,125,166. For 2011 they reported carryover charitable contributions of $2,125,166 and claimed $1,071,170 in deductions (including additional gifts of $2,537); and for 2012 they reported a carryover of $1,056,533 and claimed deductions of $1,060,079 (including additional gifts of $3,546).

Examination, SNOD, and Tax Court petition

The IRS examined the Emanouils' 2010, 2011, and 2012 returns and issued a statutory notice of deficiency ("SNOD") dated December 2, 2016, disallowing the carryover charitable contribution deductions claimed for 2010, 2011, and 2012

**[\*30]** and determining an accuracy-related penalty for each of those years. The SNOD included a Form 886-A, "Explanation of Items," which stated the grounds for disallowing the deductions as: failure to substantiate the reported values of properties transferred; failure to show that the properties were transferred with charitable intent; and failure to show sufficient bases for claimed deductible amounts. (The SNOD did not state that the Emanouils' failed to satisfy the "qualified appraisal" requirements of section 170(f)(11)(C).)

The Emanouils timely filed a petition to challenge the IRS's determinations in the SNOD. This case was tried in Boston, Massachusetts, in October 2018.

OPINION

I.    Burden of proof

In general, the IRS's deficiency determinations in an SNOD are presumed correct, and the taxpayers bear the burden to prove otherwise and to show their entitlement to any claimed deduction. See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). Proving entitlement to a claimed deduction generally includes proving that the taxpayers satisfied the specific requirements for any deduction claimed. INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992).

Section 7491(a) provides an exception that shifts the burden of proof to the Commissioner as to any factual issue relevant to the taxpayers' liability if they

**[*31]** provide credible evidence with respect to that issue and also substantiate the item, maintain records, and cooperate with the Commissioner's reasonable requests for information. Taxpayers bear the burden of proving that they have met the section 7491(a) requirements. Rolfs v. Commissioner, 135 T.C. 471, 483 (2010), aff'd, 668 F.3d 888 (7th Cir. 2012).

Rule 142(a)(1) provides that the Commissioner shall bear the burden of proof "in respect of any new matter, increases in deficiency, and affirmative defenses, pleaded in the answer". A new theory that "merely clarifies or develops the original determination is not a new matter". Wayne Bolt & Nut Co. v. Commissioner, 93 T.C. 500, 507 (1989). But a new theory that either "alters the original deficiency or requires the presentation of different evidence" is a new matter for which the Commissioner bears the burden of proof. Id. In this case the Commissioner's argument that the Emanouils failed to satisfy the "qualified appraisal" requirements of section 170(f)(11)(C) does not appear in the SNOD (nor in the Commissioner's answer, nor in his pretrial memorandum) and is therefore "new matter" as to which the Commissioner bears the burden of proof.

When each party has satisfied its burden of production by offering some evidence, then the party supported by the greater weight of the evidence will prevail, and thus the burden of proof has real significance only in the event of an

**[\*32]** evidentiary tie. See Knudsen v. Commissioner, 131 T.C. 185, 189 (2008),

supplementing T.C. Memo. 2007-340. We do not perceive an evidentiary tie in

this case and are able to decide the issues on the preponderance of the evidence.

The issues are: (1) whether the contributions of the Allie Lane parcel and lots 2

and 3, respectively, were deductible contributions for purposes of section 170,

(2) if so, what was the fair market value of those contributions, and (3) whether

accuracy-related penalties apply.

II.     Charitable contributions

    A.     General requirements

Section 170(a)(1) provides that a taxpayer may deduct any charitable

contribution (as defined under subsection (c)) made in the taxable year.

Section 170(c) defines the term "charitable contribution" as a contribution or gift

to or for the use of a qualified recipient. (There is no dispute here that the donee

town was a qualified recipient.) In order for a charitable contribution to be

deductible, the contribution must be verified under regulations prescribed by the

Secretary, i.e., the taxpayer must comply with specified reporting requirements.

Sec. 170(a). For deductions in excess of $5,000, the taxpayer must obtain a

qualified appraisal of the property, attach to the tax return a fully completed

appraisal summary (i.e., Form 8283), and maintain records regarding the property,

[*33] the terms of the contribution, and the donee organization.  See

sec. 170(f)(11)(C); 26 C.F.R. sec. 1.170A-13(c)(2), Income Tax Regs.

The Commissioner argues that the Emanouils failed to properly substantiate

their contributions because their appraisals attached to their returns for the years of

the contributions[13] did not identify the dates (or expected dates) of the

contributions and did not contain statements that the appraisals were prepared for

income tax purposes--i.e., the appraisals were not "qualified appraisals".  See 26

C.F.R. sec. 1.170A-13(c)(2)(i)(A), (3).

### B.    Qualified appraisal

#### 1.    The requirements generally

Section 170(f)(11)(C) provides that, "[i]n the case of contributions of

property for which a deduction of more than $5,000 is claimed," the taxpayer must

"obtain[] a qualified appraisal of such property and attach[] to the return * * *

such information regarding such property and such appraisal as the Secretary may

require."  The regulations define the term "qualified appraisal" as an appraisal

document that, among other things, "[i]ncludes the information required by

paragraph (c)(3)(ii) of this section".  26 C.F.R. sec. 1.170A-13(c)(3)(i).  Paragraph

---

[13]The Commissioner does not assert any distinct defects in the attachments
to the Emanouils' returns for the years for which carryover contributions were
deducted.

**[*34]** (c)(3)(ii) requires the following eleven items of information to be included

in the appraisal:

(A)  A description of the property in sufficient detail for a person who is not generally familiar with the type of property to ascertain that the property that was appraised is the property that was (or will be) contributed;

(B)  In the case of tangible property, the physical condition of the property;

(C)  <u>The date (or expected date) of contribution to the donee;</u>

(D)  The terms of any agreement or understanding entered into * * * by or on behalf of the donor or donee that relates to the use, sale, or other disposition of the property contributed * * *;

(E)  The name, address, and * * * the identifying number of the qualified appraiser * * *;

(F)  The qualifications of the qualified appraiser who signs the appraisal, including the appraiser's background, experience, education, and membership, if any, in professional appraisal associations;

(G)  <u>A statement that the appraisal was prepared for income tax purposes;</u>

(H)  The date (or dates) on which the property was appraised;

(I)  The appraised fair market value * * * of the property on the date (or expected date) of contribution;

(J)  The method of valuation used to determine the fair market value, such as the income approach, the market-data approach, and the replacement-cost-less-depreciation approach; and

**[*35]**         (K)  The specific basis for the valuation, such as specific comparable sales transactions or statistical sampling, including a justification for using sampling and an explanation of the sampling procedure employed.  [Emphasis added.]

Of these 11 items, the Commissioner points to the absence from the appraisals at issue here of only the two items underlined above--i.e., the expected date of the contribution and a statement that the appraisal was prepared for income tax purposes.

2.    Strict vs. "substantial" compliance

Strict compliance will necessarily satisfy the elements of a qualified appraisal.  However, the taxpayer who does not strictly comply may nevertheless satisfy the elements if he has substantially complied with the requirements.  That is, the above requirements are "directory" (i.e., "helpful to respondent in the processing and auditing of returns on which charitable deductions are claimed") rather than "mandatory" (i.e., literal compliance is required); and "[t]he fact that a Code provision conditions the entitlement of a tax benefit upon compliance with respondent's regulation does not mean that literal as opposed to substantial compliance is mandated."  Bond v. Commissioner, 100 T.C. 32, 41 (1993); see also Costello v. Commissioner, T.C. Memo. 2015-87, at *22; cf. Hewitt v. Commissioner, 109 T.C. 258, 264 (1997) (holding that substantial compliance

**[\*36]** would not apply where the taxpayers "furnished practically none of the information required by either the statute or the regulations"), aff'd without published opinion, 166 F.3d 332 (4th Cir. 1998).

In Cave Buttes, L.L.C. v. Commissioner, 147 T.C. 338 (2016), we noted the legislative history of the qualified appraisal statute and observed that its purpose was to provide the Commissioner with sufficient information to "deal more effectively with the prevalent use of overvaluations." Id. at 349-350 (citing S. Prt. 98-169 (Vol. I), at 444-445 (S. Comm. Print 1984), and Staff of J. Comm. on Taxation, General Explanation of the Revenue Provisions of the Deficit Reduction Act ["DEFRA"] of 1984 ("General Explanation"), at 505-508 (J. Comm. Print 1985)). In Alli v. Commissioner, T.C. Memo. 2014-15, at \*56, we stated that the purpose of the appraisal requirements is to "ensur[e] that the correct values of donated property are reported". Accordingly, it would follow that if the appraisal at issue does generally provide the information required in the regulations to do just that--i.e., to ensure that the correct values of donated property are reported-- then the "essential requirements of the governing statute", Estate of Evenchik v. Commissioner, T.C. Memo. 2013-34, at \*12 (quoting Estate of Clause v. Commissioner, 122 T.C. 115, 122 (2004)), can be satisfied despite certain defects that may not be significant in a given case.

**[*37]** This case does not involve the abuse, mentioned in the General Explanation, arising from "tax shelter promotions".[14] But Congress was also "concerned with situations, not involving organized tax shelters, where individuals overvalue donated property * * *, such as <u>interests in real estate</u>". General Explanation at 503 (emphasis added.) The property that the Emanouils contributed was real estate, but the phrase "<u>interests in</u> real estate" especially connotes and implicates partial interests, such as easements. A deduction for the contribution of a conservation easement is permitted by section 170(h); but such partial interests in real estate are seldom the subject of arm's-length transactions, and valuing them reliably involves special challenges, which qualified appraisal rules address. Of course, one could also overvalue an owner's entire property held in fee simple

---

[14]As was explained in Staff of J. Comm. on Taxation, General Explanation of the Revenue Provision of the Deficit Reduction Act of 1984, at 503 (J. Comm. Print 1985):

> Congress recognized that in recent years, opportunities to offset income through inflated valuations of donated property have been increasingly exploited by tax shelter promoters. Under typical tax shelter promotions, individuals acquire objects such as limited edition lithographs, books, gems, and the like, hold the property for at least the capital gains holding period, and then contribute the items to a museum, library, educational institution, or other qualified donee at their "appreciated" fair market value. The shelter package may include an "independent" appraisal, and the potential donor may be assured that his or her subsequent gift will be accepted by a charitable organization.

**[\*38]** absolute, and the substantiation rules do apply to contributions of entire interests as well; but they were not the bull's eye at which DEFRA took aim.

The Emanouils contributed not an easement or other partial interest but rather their entire fee simple interest in the Allie Lane parcel and in lots 2 and 3, and the valuation issue here is the garden-variety question of the fair market values of pieces of real estate. In the absence of a heightened potential for abuse, it is appropriate to recall that Congress generally favors charitable giving and that the courts have honored that legislative intent by broadly construing statutes "begotten from motives of public policy" like section 170 and similar statutes "enacted to benefit * * * charitable organizations". See Helvering v. Bliss, 293 U.S. 144, 150-151 (1934); Estate of Crafts v. Commissioner, 74 T.C. 1439, 1455 (1980) ("As a relief provision which inures to the benefit of charity, we believe that it should be construed liberally so that the intended charitable purposes are furthered").

The Emanouils acknowledge that they did not strictly comply with the requirements--since neither of their appraisals stated the date of contribution or stated that it was prepared for income tax purposes--but they argue that they substantially complied with the qualified appraisal requirements. Because this is not a case where the taxpayers "furnished practically none of the information

[*39] required", the substantial compliance doctrine can apply. Hewitt v. Commissioner, 109 T.C. at 264. To that end we consider whether the Emanouils provided most of the information required (they did) and whether the defects in their appraisals were so significant that they failed to establish the "substance or essence" of a "qualified appraisal" (they were not). See Hewitt v. Commissioner, 109 T.C. at 265; Bond v. Commissioner, 100 T.C. at 42.

### 3. Date of contribution

The Commissioner points to no specific purpose for the requirement that the date (or expected date) of contribution be included in a qualified appraisal. We have previously held that "[r]equiring an appraisal to include the actual or expected date of the contribution allows an individual (such as the Commissioner's revenue agent) to compare the appraisal and contribution dates for purposes of isolating fluctuations in the property's fair market value between those dates." Rothman v. Commissioner, T.C. Memo. 2012-163, slip op. at 36 (finding no substantial compliance in a facade easement case where the appraisal failed to satisfy several substantiation requirements including the requirement to provide the date (or expected date) of the contribution), supplemented and vacated in part on other grounds by T.C. Memo. 2012-218. In this case the appraisals were dated within 30 days of the contributions, and in each instance the appraisal

[*40] explicitly stated that it gave "a current market value" (emphasis added), rather than a historic value as of a previous date.

We have held that failing to include the date of contribution in the appraisal is not significant when the return includes a Form 8283 that specifies the date of contribution. See Zarlengo v. Commissioner, T.C. Memo. 2014-161, at *36 (finding that taxpayers substantially complied by disclosing contribution date on appraisal summary); Simmons v. Commissioner, T.C. Memo. 2009-208, 98 T.C.M. (CCH) 211, 215 (2009) (same), aff'd, 646 F.3d 6 (D.C. Cir. 2011). Because the Emanouils' returns for 2008 and 2009 included the respective Forms 8283 and disclosed the respective dates of the contributions, the absence of that information from the appraisal is not fatal in this case.

### 4. Income tax purpose

The Commissioner explains in his brief the reason that the statute requires an appraisal to include a statement that it was prepared for income tax purposes:

> The requirement of a statement of the intended use for an appraisal is intended to mirror the appraisal requirements set forth in the Uniform Standards of Professional Appraisal Practice ("USPAP"). * * * The USPAP, Statement 9 for 2008-2009 further states:
>
>> Identification of the intended use is one of the assignment elements necessary to properly identify the appraisal, appraisal review, or appraisal consulting problem. Identification of the

**[*41]** intended use helps the appraiser and the client make two important decisions about the assignment:

the appropriate scope of work for the appraisal, appraisal review, or appraisal consulting development process; and

the level of detail to provide in the appraisal, appraisal review, or appraisal consulting report.

In other words, the importance of providing an income tax purpose statement is to help the appraiser and the client identify the appropriate scope of work for the appraisal and the level of detail to provide in the appraisal, i.e., to make sure that all the information required for relying on the appraisal--for income tax purposes-- is included in the appraisal.[15]  But we do not perceive that the appraisals at issue here reflect any lack of this information.  Although we accept the importance of a shared understanding by appraiser and client of the purpose of an appraisal, a statement of purpose may not always be necessary to achieve substantial compliance, especially not when the appraisal otherwise includes the level of

---

[15]The Senate Committee on Finance provided the following explanation for the requirement of stating the income tax purpose of the appraisal:  "[T]he appraisal must state that it is being prepared for income tax purposes, and must be signed by the appraiser, whose tax identification number must be listed.  Accordingly, the appraiser is a person to whom the civil tax penalty for aiding and abetting an understatement of tax liability (sec. 6701) could apply."  S. Prt. 98-169 (Vol. I) at 446 (S. Comm. Print 1984).  The Commissioner makes no mention of this rationale from the legislative history, nor how it would affect the analysis of "substantial compliance" in this case, so we do not address this rationale further.

**[\*42]** detail necessary to estimate the fair market value of the property in question. See <u>Consol. Inv'rs Grp. v. Commissioner</u>, T.C. Memo. 2009-290, slip op. at 58 (finding substantial compliance where "[t]he appraisal did lack a statement that it was prepared specifically for income tax purposes; however, we find this omission to be insubstantial").

The purpose stated in the appraisals in this case was "[t]o inform a potential disposition". The appraiser elaborated at trial:

Q    And what was the purpose of this appraisal?

A    The purpose of this appraisal was to prepare a market-value opinion for the property in question.

Q    And when you're preparing a market-value appraisal, does the intended use or user of the appraisal affect the potential value conclusion?

A    Market value is market value, and whether you are preparing this for an owner or a bank, or a public entity, or for any purpose, that market value premise governs, and the analysis must be true to that principle. The intended use and user is inconsequential.

It is certainly true that there is no such thing as an "income tax value" distinct from fair market value. A competently performed valuation that was prepared for income tax purposes should be identical to a valuation prepared for advising a sale. The appraisals used the word "disposition", a term broad enough to include a sale or (as was relevant) a donation. There is no reason to suppose that

**[\*43]** Ms. McKinney's valuation would have been different if its stated purpose had been "income tax".

We have not previously held that failing to include a statement of income tax purpose in an appraisal would by itself defeat substantial compliance for purposes of a claimed deduction for a charitable contribution. Cf. Irby v. Commissioner, 139 T.C. 371, 387 (2012) ("The IRS has not provided to the public a specific form for the tax purpose statement, and respondent has not proffered any instance where a suboptimal tax purpose statement, by itself, invalidated an otherwise qualified appraisal"); Alli v. Commissioner, T.C. Memo. 2014-15, (finding that an appraisal was not qualified because of at least five failures including the lack of a statement of an income tax purpose and, more significantly, because the appraisal was nearly 10 years old and failed to use any of the three commonly accepted approaches (capitalization, cost, or comparable sales) to determine fair market value); Estate of Evenchik v. Commissioner, T.C. Memo. 2013-34 (finding that an appraisal was not qualified because of numerous failures including the lack of an income tax purpose statement and, most significantly, the appraisal valued the wrong asset).

In this case each appraisal valued the correct asset (a fee simple interest in real property) according to the correct standard (fair market value); each was

**[*44]** prepared within 30 days of the date of contribution; and each used a commonly accepted approach (the income approach) to estimate fair market value for the contribution (discussed below in part III). In other words, the appraisals do not have multiple cumulative defects that we have previously held to be fatal for deducting charitable contributions.

We hold that the Emanouils provided sufficient information to permit the IRS to evaluate the reported contributions and to investigate and address concerns about overvaluation and other aspects of the reported charitable contributions. The IRS did perform that investigation without any impediment arising from the two alleged defects in the appraisals, and the SNOD issued by the examination personnel did not mention the omissions (which, rather, were raised for the first time in this litigation). Thus, the Emanouils have substantially complied with the regulations for qualified appraisals.

C.    Quid pro quo

The Supreme Court in Hernandez v. Commissioner, 490 U.S. 680, 701-702 (1989), stated: "The relevant inquiry in determining whether a payment is a 'contribution or gift' under § 170 is * * * whether the transaction in which the payment is involved is structured as a quid pro quo exchange." In examining whether a transfer was made with the expectation of a quid pro quo, we give most

[*45] weight to the external features of the transaction, avoiding imprecise inquiries into taxpayers' subjective motivations. See id. at 690-691. If it is understood that the property will not pass to the charitable recipient unless the taxpayer receives a specific benefit, and, most relevant to our determination in this case, if the taxpayer cannot garner that benefit unless he makes the required "contribution", then the transfer does not qualify the taxpayer for a deduction under section 170. See Graham v. Commissioner, 822 F.2d 844, 849 (9th Cir. 1987), aff'g 83 T.C. 575 (1984), aff'd sub nom. Hernandez v. Commissioner, 490 U.S. 680 (1989).

The Commissioner argues that the Emanouils' case fails the quid pro quo analysis for various reasons, most notably for reasons similar to those in Pollard v. Commissioner, T.C. Memo. 2013-38. Specifically, the Commissioner argues that Mr. Emanouil used the proposed donations as a "bargaining chip" to induce the town's ZBA to approve the Graniteville Woods comprehensive permit and that once the donations had been proposed, they could not be separated from the negotiations. See id. at *18-*25.

However, having heard the testimony of the witnesses as they were examined and cross-examined, we conclude that the donations were given with donative intent, were received as gifts, and were not an inducement for the ZBA's

[*46] approvals. Rather, Mr. Emanouil had acquired the 197 acres in order to do as big and profitable a development as he could; and when the reasonable prospect proved to be not 197 acres (which the flexible development plan would have used), nor 150 acres (which the LIP would have used), but only 104 acres, he then needed to decide what to do with the excess. No prospects to sell the property panned out, and he rationally considered the possibility of making a charitable donation of the property and receiving a tax benefit. It was natural that he thought of the town as a donee--not because he could get a benefit from the town but because the town was a known, nearby entity that could receive a tax-deductible contribution and might want the property. In his letter in November 2008 (sent to the ZBA's fiscal impact consultant) and at a meeting in December 2008 (with the town's Conservation Commission), Mr. Deschenes did mention Mr. Emanouil's intention to donate the Allie Lane parcel and may in effect have suggested the donation as a possible "mitigation" that the ZBA might consider. But the ZBA did not respond to this suggestion, did not thereafter include such a donation in its required mitigations, and dropped the idea from its considerations.

The evidence does not suggest that, without the additional contributions, Mr. Emanouil would have been unable to secure the ZBA's approval or could not have appealed a denial and otherwise secured the comprehensive permit. See

**[\*47]** <u>Graham v. Commissioner</u>, 822 F.2d at 849 (holding that "where it is understood that the taxpayer's money will not pass to the charitable organization unless the taxpayer receives a specific benefit in return, <u>and where the taxpayer cannot receive the benefit unless he pays the required price</u>, then the transaction does not qualify for the deduction under section 170" (emphasis added)); <u>Bd. of Appeals of Woburn v. Hous. Appeals Comm.</u>, 887 N.E.2d 1051, 1054-1055 (Mass. 2008) (explaining that denying a comprehensive permit requires a local concern which supports the denial and that outweighs the regional housing need).

In the process that led to the eventual approval of the project, the ZBA was clear and frank about concessions that it would require of Mr. Emanouil before it would give approvals. Those numerous concessions--expressly required by the ZBA and granted by Mr. Emanouil--included Mr. Emanouil's donation of an open space conservation easement on approximately 68 acres of lot 1 and the reduction of the overall size of the development from 248 units down to 164 (despite the approval letter from MassHousing for 248 units) to address the town's concerns as identified in the MassHousing approval letter. The evidence does not suggest any reason to suppose that, in addition to these requirements, the town would also have expected two gifts of additional property in return for its approvals <u>but</u> would have refrained from putting the requirement in writing, instead trusting

[*48] Mr. Emanouil to carry through with an unenforceable secret undertaking. If the town was indeed requiring these additional concessions, it is highly unlikely that it would have given the approvals before receiving the second of his two gifts, and unlikely that it would have let six months go by after granting its approval before the second gift was made.

Furthermore, the Commissioner has not produced (and we do not find to exist) any documents or other evidence that shows the town directing the ZBA not to approve the project unless the additional donations of the Allie Lane parcel and lots 2 and 3 were included as a surreptitious part of the proposal. Cf. Pollard v. Commissioner, T.C. Memo. 2013-38. No witness testified that there was any quid pro quo arrangement. To the contrary, the relevant witnesses--not only Mr. Emanouil and Mr. Deschenes but also the ZBA chair, Mr. Herrmann--testified credibly that there was no quid pro quo with respect to the donations and the ZBA's approval of the Graniteville Woods comprehensive permit.

One can imagine a circumstance in which two parties with mutual interests and a high level of trust could conduct some business with each other (here, the application for and approval of permits) that depended on a side agreement (here, for the donation of additional property) that was never reduced to writing and could never be enforced. That is, in effect, what the Commissioner posits, but we

**[\*49]** find it is unlikely here. The town and Mr. Emanouil seem to have had civil and cooperative business dealings, but they were hardly allies. About eight years earlier he had sued the town concerning another property acquisition, so they had no reason for special trust of each other.

We are persuaded by the evidence that Mr. Emanouil's concessions to secure the ZBA's approval were those that he and the town expressly negotiated and to which they agreed, and that his contribution of the Allie Lane parcel and lots 2 and 3 was not a quid pro quo for that approval.

## III. Valuing the contributions

### A. General principles

In general, the amount of a charitable contribution of property under section 170(a) is the "fair market value" of the property at the time it is contributed. See 26 C.F.R. sec. 1.170A-1(a), (c)(1). The regulations define "fair market value" as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." Id. para. (c)(2). Valuation is not a precise science, and the fair market value of property on a given date is a question of fact to be resolved on the basis of the entire record. See, e.g., Kaplan v. Commissioner, 43 T.C. 663, 665 (1965); Arbini v. Commissioner, T.C. Memo.

[*50] 2001-141. In considering the evidence in the record, we take into account not only the current use of the property but also its highest and best use. See Stanley Works & Subs. v. Commissioner, 87 T.C. 389, 400 (1986); 26 C.F.R. sec. 1.170A-14(h)(3)(i) and (ii). A property's highest and best use is the highest and most profitable use for which it is adaptable and needed or likely to be needed in the reasonably near future. Olson v. United States, 292 U.S. 246, 255 (1934). The highest and best use can be any realistic, objective potential use of the property. Symington v. Commissioner, 87 T.C. 892, 896 (1986).

The parties have offered the reports and testimonies of expert witnesses to establish the value of the contributions. We evaluate expert opinions in the light of the expert's demonstrated qualifications and all other evidence in the record. See Parker v. Commissioner, 86 T.C. 547, 561 (1986). Where experts offer competing estimates of fair market value, we decide how to weight those estimates by, inter alia, examining the factors they considered in reaching their conclusions. See Casey v. Commissioner, 38 T.C. 357, 381 (1962). We are not bound by the opinion of any expert witness, and we may accept or reject expert testimony in the exercise of our sound judgment. Helvering v. Nat'l Grocery Co., 304 U.S. 282 (1938); Estate of Newhouse v. Commissioner, 94 T.C. 193, 217 (1990). We may also reach a decision as to the value of property that is based on our own

[*51] examination of the evidence in the record. <u>Silverman v. Commissioner</u>, 538 F.2d 927, 933 (2d Cir. 1976), <u>aff'g</u> T.C. Memo. 1974-285.

B.    <u>Allie Lane</u>

The Emanouils rely on an appraisal by Pamela McKinney from BMA for determining the contribution value of the Allie Lane parcel. The appraisal used an income approach for the undeveloped parcel and determined the highest and best use was as a 12-lot subdivision that would be worth $1.5 million. Ms. McKinney's valuation (and, in particular, its determination of highest and best use) relied on a capacity study undertaken by Hancock Associates, a civil engineering firm, which concluded that the property had a potential for 12 finished lots. On the basis of information obtained by Mr. Deschenes, Ms. McKinney determined that an additional access point necessary for development could be acquired from owners of abutting property for $50,000 to $100,000.

Ms. McKinney's appraisal estimated an absorption rate of three to four lots annually--though zero sales in the first year to allow for permitting and entitlements (i.e., waivers for road extensions and right-of-way acquisitions to access the property). She estimated a sale price of $300,000 per lot on the basis of sales of comparable properties ranging from $200,000 to $400,000 in Westford and surrounding communities. Ms. McKinney then adjusted for various costs

[*52] (legal fees, construction, etc.) and applied a discount rate of 20% (based on actual rates of 14% to 37% with a 23% average and pro forma rates of 12% to 32% with a 20% average) and determined a resulting value of $1.5 million for the 12 lots, approximately $125,000 per lot.[16]

The Commissioner relies on an appraisal by Michael Hart from LandVest, Inc., who ultimately determined that the highest and best use for the Allie Lane parcel was not as a development but as land held for passive recreation, with a resulting value of $130,000. Mr. Hart dismissed the possibility of developing the parcel into 12 lots. Neither Mr. Hart nor the Commissioner took issue with the layout or general feasibility of the 12 potential lots; but instead, the primary objection to Ms. McKinney's proposed development use was the fact (noted above) that, to be developed, the property would need a 1,500-foot road extension from Allie Lane, which already exceeded the 1,000-foot limit on dead-end roads in Westford. Mr. Hart opined that any extension of that 1,000-foot limit would have required a waiver from the town; and despite precedent that such a waiver could

---

[16]BMA's 2008 appraisal was lower than, but conceptually consistent with, a prior appraisal of the Allie Lane parcel that Ms. McKinney had prepared for the Emanouils in 2006 when the town was considering the potential purchase of all 197 acres. The 2006 appraisal valued the Allie Lane parcel at $1.9 million with the highest and best use as a 12-lot development (as in the 2008 appraisal) but using a shorter sellout period of two years and applying a lower discount rate of 18%.

**[*53]** be obtained, he opined that the waiver would be granted only if the owner obtained an additional access point for emergency vehicles. Mr. Hart's appraisal acknowledged such access could have been purchased from one of the owners of abutting land (which included the town itself, as the owner of the adjacent parcel where the highway garage was located). But he considered that possibility too "speculative": "In my opinion, the forgoing combination of contingencies make subdivision a much too speculative assumption on which to base the market value of the subject Allie Lane parcel in its 'as-is', non-permitted condition as of the effective valuation date." Ultimately Mr. Hart opined that development of 12 lots was not feasible because of the required road extension and that therefore the highest and best use of the Allie Lane parcel was for passive recreation, with a sales-comparison value of $130,000, approximately $8,000 per acre. Thus, the primary point of contention between the two appraisals is whether a waiver could be obtained to extend Allie Lane for a 12-lot development.

Ms. McKinney's valuation assumed that all the applicable permits (or waivers) would be obtained for the potential development, and her valuation thus included--but discounted--the value of the potential 12 lots in her appraisal. At trial, Ms. McKinney explained that with larger scale projects involving hundreds of units, the permitting process can be very difficult because there are more

**[*54]** significant concerns with how the project might affect a community; however, developing 12 lots is (she credibly explained) not fraught with the same level of concern, and thus it is customary for an appraiser to assume that permits on such projects can be obtained and to estimate the value accordingly. Ms. McKinney further explained that obtaining such permits would be reflected in discount rates and absorption period, as she had done in her appraisal.

As for the reasonableness of obtaining road-extension permits or waivers from the town, Joseph Penzola (director of engineering for Hancock Associates) testified credibly on the basis of his prior experience that the town has previously approved, as alternatives to additional emergency access, various measures to mitigate the concerns for road extensions and access for emergency vehicles, e.g., installing additional sprinkler systems in homes, or providing a gated access or preserving a dedicated lane specifically for emergency vehicles. He testified that such mitigation was approved 50% of the time, depending on the community.

To the same effect, Mr. Deschenes testified that he has requested and received waivers for dead-end road extensions on behalf of various clients over the years, and that with respect to secondary access for emergency vehicles, the town was already concerned, on its own behalf, that there was only one point of access to the highway garage. Mr. Deschenes observed that granting a waiver to

[*55] extend Allie Lane could have provided the town with a second access point through Allie Lane and that such access had been a primary interest when the town considered purchasing the Allie Lane parcel in 2006 and 2007. We are persuaded that it was reasonable to assume that a waiver to extend Allie Lane for the 12-lot development could be obtained. Furthermore, we are satisfied that Ms. McKinney's appraisal made appropriate adjustments in its discount rate and sellout period to account for the additional time and costs to obtain the waiver. Thus, we find that, as Ms. McKinney reasonably determined, the fair market value of the Allie Lane parcel was $1.5 million.

C.    Lots 2 and 3

Ms. McKinney and Mr. Hart also each provided appraisals of lots 2 and 3. Ms. McKinney determined that the highest and best use was as a 38-lot development--on the basis of a capacity plan prepared, again, by Hancock Associates--with the total development valued at $2.5 million. Ms. McKinney used an income approach to value the property. She determined an absorption rate of four to five lots annually with a total sellout period of eight years and estimated that the value of each lot was approximately $280,000, noting the real estate market had begun to stabilize in the second quarter of 2009 and that sale prices of comparable properties ranged from $225,000 to $450,000. Ms. McKinney also

[*56] determined that there would be no increase in lot prices for the first two years and then a 3% increase each year thereafter. For value reductions she applied a discount rate of 20%, noting that discount ranges had increased 150 basis points from the fourth quarter 2008 average, and she made reductions for legal fees and other development costs--all of which resulted in the final value of $2.5 million, or approximately $66,000 per lot.

Mr. Hart's appraisal determined that the highest and best use of lots 2 and 3 was to divide the lots into a total of six new lots: four lots (approximately 2.75 acres each) that would have road frontage and could be developed for residential use without requiring subdivision approval, and two lots (approximately 21.4 acres each) that could not be developed because they would lack road frontage but would instead be held for recreation purposes. Mr. Hart determined that the total value of the property put to this use was approximately $1,420,000. Despite his preferred six-lot development, Mr. Hart's appraisal acknowledged that lots 2 and 3 could be developed into a 38-lot development as proposed in the Hancock Associates capacity plan. However, Mr. Hart determined that the total value of a 38-lot development would be only $1,060,000 (not Ms. McKenney's estimated $2.5 million). In reaching his conclusion, Mr. Hart first calculated the value of the potential 38-lot development using a 22.5% discount rate (rather than

[*57] Ms. McKinney's 20%)--presuming that entitlements would be obtained--and an average sale price of $240,000 per lot (rather than Ms. McKinney's $280,000). Mr. Hart then reduced the value for various costs and estimated a final value of $1,580,000, or $42,000 per lot. He then raised his discount rate to 26.5% (adding 400 basis points to account for the lack of entitlements) and increased the projected sellout period by 12 months for the entitlement approval period. These adjustments resulted in a $1,060,000 value for the 38 lots if developed.

Thus, both appraisers agreed that the Hancock Associates 38-lot plan was possible. The difference in their valuations arises from the different manner in which each appraiser accounted for risks attributable to entitlements and the status of the real estate market during 2009. The Emanouils argue that Mr. Hart improperly compounded risk factors by both applying a higher discount rate of 26.5% on a semi-annual basis and also assuming an 18-month period during which no lots would be sold. Though they do not agree with either adjustment, the Emanouils argue that only one such adjustment should have been applied to account for the stated risks of obtaining entitlements and combating an uncertain real estate market. The Emanouils argue further that Mr. Hart compounded the same market risks by selecting an "overly conservative" $240,000 lot price "selected from such a limited range of comparable sales" (using sales from only

**[\*58]** two of the nearby towns) in order to arrive at $1,060,000 valuation of the 38-lot development.

The Commissioner offers general critiques of Ms. McKinney's appraisal, arguing that she relied on a subdivision plan prepared by another person (a plan, however, on which the Commissioner's expert was also content to rely), that she used too favorable data for comparable sales (taken from higher priced neighborhoods), that she applied too low a discount rate, and that she further failed to make downward adjustments to the discount rate to account for lack of entitlements.[17]

We agree with the Emanouils and are persuaded that Ms. McKinney's 2009 appraisal reasonably estimated the fair market value of lots 2 and 3. As to the Commissioner's critiques, we find that Ms. McKinney used reasonable inferences when selecting her discount rate and absorption periods; and with respect to her

---

[17]The Commissioner also argued that Ms. McKinney failed to account for a protected wildlife habitat and perchlorate contamination that could have added costs to the development. On the basis of testimony and other evidence regarding environmental impact studies and soil testing for the suitability for a septic system, and the town's apparent responsibility for the origin of the potential perchlorate contamination, we are persuaded that there was minimal economic risk with respect to protected wildlife and that any such risk would be mitigated in Ms. McKinney's estimated absorption period. The Commissioner's expert did not quantify the perchlorate problem nor its cost, and we find that this issue (which the town might have been obligated to mitigate) was not material to the value of lots 2 and 3.

[*59] sales of comparable properties, we find that she made reasonable downward adjustments for homes in the more favorable areas, and we agree with her final average value per lot. With respect to entitlements, we find that Ms. McKinney's absorption period accounted for the time needed to obtain entitlements and that it was reasonable for Ms. McKinney to have presumed entitlements would be secured--as Mr. Hart also presumed. Thus, we find that, as Ms. McKinney reasonably determined, the fair market value of lots 2 and 3 was $2.5 million.

IV.    Penalties

Section 6662(a) and (b) imposes an accuracy-related penalty if any part of an underpayment of tax required to be shown on a return is due to negligence, a substantial understatement of income tax, or a substantial valuation misstatement. The penalty is equal to 20% of the portion of the underpayment to which the section applies. Section 6662(e)(1)(A) provides that a valuation misstatement is "substantial" if the value claimed on the return is "150 percent or more of the amount determined to be the correct amount". Section 6662(h) provides that in the case of a "gross valuation misstatement", where the value claimed on the return is 200% or more of the amount determined to be the correct amount, the penalty is increased from 20% to 40%. We have found that the value of the contributions of the Allie Lane parcel and lots 2 and 3 were $1.5 million and

**[*60]** $2.5 million, respectively--as the Emanouils reported on their returns. Since we do not sustain the deficiencies in tax that the IRS determined, penalties do not apply in this case.

To reflect the foregoing,

<u>Decision will be entered for</u>

<u>petitioners</u>.